[No. F009379. Fifth Dist. May 25, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
CLEMENTE BELTRAN, Defendant and Appellant.

[Opinion certified for partial publication.*]

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I, II and IV.

COUNSEL

Eric L. Henrikson, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Roger E. Venturi and Gelacio L. Bayani, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—

### STATEMENT OF THE CASE

Appellant was charged in an information with the murder of Armando de la Torre (Armando) in violation of Penal Code section 187 (count I); attempted murder of Maria del Carmen Albizures (Maria) in violation of Penal Code section 664/187 (count II); and, alternatively, assault with a firearm on Maria in violation of Penal Code section 245, subdivision (a)(2) (count III). It was further alleged that in the commission of all of the above crimes appellant personally used a firearm, to wit, a handgun, within the meaning of Penal Code section 12022.5, and that in the commission of counts II and III appellant intentionally inflicted great bodily injury upon Maria and thus was subject to the sentence enhancement of Penal Code section 12022.7.

Appellant pled not guilty to all counts and denied the enhancement allegations.

The trial court denied appellant's *in limine* motion to exclude any in-court identification of appellant by Maria.

The jury found appellant guilty of first degree murder (count I) and first degree attempted murder (count II) and found the enhancement allegations to be true. He was found not guilty of assault with a firearm (count III) since that was an alternative to attempted murder.

The trial court sentenced appellant to state prison for an aggregate term of 39 years to life, computed as follows: for the murder (count I), appellant was sentenced to 25 years to life with a 2-year enhancement for firearm use; for the attempted murder (count II), appellant was given a consecutive

sentence of 9 years with a 3-year enhancement for intentionally inflicting great bodily injury on Maria. (Pen. Code, § 12022.7.) The two-year enhancement for firearm use (Pen. Code, § 12022.5) on count II was stayed pursuant to Penal Code section 654.

Appellant filed a timely notice of appeal.

### STATEMENT OF THE FACTS

*The Prosecution Case*

At approximately 10 p.m. on April 22, 1983, Jose Kamey gave Maria a ride to the Los Panchos Bar in Mendota where she met her boyfriend, Armando. Maria and Armando drank beer and danced until about 1 a.m. While exiting the bar, Maria saw a man she did not know who was wearing a checkered shirt, Levi's pants and jacket, a brown cowboy hat, and boots. The man, later identified by Maria as appellant, asked Armando for a ride. Armando agreed.

Maria, Armando and appellant walked to Armando's car, which was parked approximately half a block from the bar. It appeared to Maria that the men were friends, or at least knew each other by name. She heard Armando address appellant as "Valente" or "Clemente."

Soon after they left in the car Maria noticed that the conversation changed from being friendly. Appellant threatened to kill Armando if he didn't pay off a $200 debt. Armando said he did not have enough money in his possession but offered to return to the bar and ask some friends for funds. Appellant refused the offer and challenged Armando to get out of the car and fight.

The car came to a stop. Appellant threatened to shoot Maria if Armando didn't get out of the car and fight. Maria opened her door slightly, turned toward appellant, and asked him why he would hurt her when she did not owe him anything and she did not know him. She added, "Why are you gonna fire at me if I don't have any problem with you? If you want to, I'll lend Armando the money so he can pay you the amount that he owes you." Appellant replied that "he didn't want the money anymore because his intention was different. . . . [H]e wanted to do something else. . . . To fire Armando and also fire at me. And for him to get off the car." The dome light illuminated the car's interior during this brief period of time, giving Maria "more time to identify the man" and the opportunity to see "he had a weapon in his hand."

Armando refused to exit the car. Instead, he told appellant "that if he wanted to fire at him, to go ahead and fire" but he better "shoot him good because if not, afterwards, they were gonna have some problems." Appellant answered with a shot to the back of Armando's head. Appellant then pointed the gun at Maria's face and fired as she raised her arm in a futile attempt to shield her face from the bullet. The bullet shattered a bone in her arm and penetrated her face at a point close to her nose and mouth, causing severe flesh wounds. Maria fell wounded to the ground outside the vehicle; while lying there, she heard two more shots.[1] After hearing footsteps and staying on the ground for about three minutes, she got up and began walking down the road looking for help. A man stopped to assist and transported her to the fire station. She was taken to the hospital where she stayed for two weeks. She later had to return to the hospital for two more operations on her arm, and one where a piece of bone was removed from her hip as a bone graft on her wrist.

Within two weeks after the attack, but while still in the hospital, Maria was contacted by Sergeant Israel Porras of the Mendota Police Department who listened to her describe the assailant and asked her to look over two photo displays. Maria picked out the photo of appellant as the assailant. On May 15, 1983, at Maria's home, a second photo lineup was conducted. She again picked out appellant's photo.

At trial, Maria identified appellant as the person who shot Armando and her. She testified that although appellant appeared somewhat different from the man who shot her, especially his hair, he still had many distinguishing features supporting the identification, such as his mustache, the style of his beard, his eyes, his facial and body characteristics, and his physique. She also identified a brown cowboy hat seized by the investigating officers from Armando's vehicle after the shootings as similar to the hat appellant was wearing the morning of the shootings. Hairs retrieved from this hat were compared against hair samples taken from appellant. The criminalist found that two of the unknown hairs exhibited the same characteristics as appellant's hairs. The criminalist testified that, although he could not definitely say the unknown hairs originated from appellant, he could not exclude appellant as the source of the unknown hairs. Further, Maria observed that the assailant had "a tooth missing." The parties stipulated that if Litman Wolfe were called as a witness he would testify that he is a dentist; that he reviewed appellant's dental chart dated July 29, 1986; that appellant was missing his four upper center teeth; and that appellant had a partial upper denture which covered the missing teeth.

---

[1] According to the pathologist, Armando "died of several gunshot wounds; one to the head and one which entered in the neck area and penetrated in through the chest, hitting the heart and lung."

In addition to Maria's testimony, the prosecution presented other witnesses. Viewing this evidence in the light most favorable to the judgment, it reveals the following:

Jose Kamey, the man who gave Maria a ride to Los Panchos Bar, testified that he saw Maria outside the bar with Armando and another person at about 1 a.m. on April 23, 1983. The other person "had features similar to Clemente's," such as height and body build. Additionally, the other person was wearing a hat similar to the one he used to see appellant wearing.

Jose de la Paz testified that he knew appellant because he had seen him in different bars in Mendota where he worked as a security guard. He recalled that on Friday, April 22, 1983, at about 7:30 p.m., he saw appellant at the Los Panchos Bar when he drove his wife to work at that bar. Approximately one week later, the police asked De la Paz to look at some photo displays. When he did, he picked out appellant's photo as the person he saw at the Los Panchos Bar the previous Friday.

Timothy Giles testified he was a Mendota police officer in April of 1983 and saw appellant twice during that month. The first time was on April 12 at appellant's residence at 1817 Jenny Avenue, Mendota, when the officer responded to that address and called an ambulance for appellant's girlfriend, Maria Guardado, who was in labor. The second time was on April 22, when Officer Giles and Reserve Officer Adrian Herrera saw appellant on the 700 block of Seventh Avenue in Mendota. At the second meeting Officer Giles talked with appellant about the baby. Appellant told him it was a girl and everything was fine. Officer Giles indicated appellant was wearing a Levi's or western-style jacket and a brown cowboy hat similar to the cowboy hat retrieved from Armando's car.

Lastly, Sergeant Porras stated that several hours before he was contacted at home on the morning of April 23 and informed about the shootings, he saw appellant leaning against the wall of Los Panchos Bar as he passed by in his car. Appellant was wearing a cowboy hat similar to the one in evidence. Officer Porras said that was the last time he saw appellant, whom he used to see regularly in Mendota.

### The Defense Case

Appellant's defense was that he was in Mexicali when the crimes were committed and had nothing to do with them.

Appellant's girl friend, Maria Guardado, testified that she was expecting a child in April 1983, and prior to the birth of the baby appellant told her

he would be leaving for Mexico after the birth to visit a sick aunt. Miss Guardado stated the baby was born on April 12 and that she last saw appellant on April 17. She subsequently received a phone call from appellant in which he told her he was in Mexicali. Miss Guardado and the baby joined appellant in Mexicali on May 10, 1983. When she returned to California in November 1984, appellant was not with her.

Juan Ramirez testified that appellant stayed with him in Mexicali for two weeks in April and May of 1983. Ramirez brought back the suitcase appellant had allegedly left behind. Ramirez did not bring appellant's cowboy hat back to California because Ramirez had used it until it was worn out. Ramirez stated that Maria Guardado was with appellant in Mexicali in April.

Appellant testified on his own behalf and denied killing Armando or shooting Maria. He claimed that on April 23, 1983, he was in Mexicali visiting his ailing aunt. He also denied Armando owed him any money and denied that the cowboy hat introduced into evidence was his.

DISCUSSION

I., II.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

III.

*Was the Trial Court's Instruction That "A Bone Fracture Constitutes Substantial And Significant Physical Injury Within the Meaning of Penal Code Section 12022.7" Reversible Error?*

The evidence of the nature and extent of Maria's injuries and treatment is undisputed. Appellant's defense was simply that he was in Mexicali when the crimes were committed. He did not in any way dispute the prosecution's evidence of Maria's injuries.

The bullet shattered a bone in Maria's arm and caused severe flesh wounds to her arm and face. She was immediately hospitalized after the attack for approximately two weeks and had two surgical operations performed on her arm and one on her face. She later returned to the hospital

---

* See footnote, *ante,* page 1295.

for two more operations on her arm, and one where a piece of bone was removed from her hip and used as a bone graft on her wrist.

The court instructed the jury, inter alia, as follows: "It is charged in Counts Two [attempted murder] and Three [assault with a deadly weapon] that in the commission of the crimes therein described, the defendant, with the specific intent to inflict such injury, personally inflicted great bodily injury on Maria Albizures.

"If you find the defendant guilty of an offense or offenses charged in Counts Two and Three, it will then be your duty to determine whether or not the defendant, with the specific intent to inflict such injury, did personally inflict great bodily injury as herein defined on Maria Albizures in the commission of those offenses. The burden is on the People to prove this beyond a reasonable doubt.

"The term 'great bodily injury' as used in this instruction means a significant or substantial physical injury. Minor or moderate injuries of a temporary nature do not constitute great bodily injury within the meaning of this instruction." The court concluded the enhancement instruction with the following paragraph: "A bone fracture constitutes substantial and significant physical injury within the meaning of Penal Code section 12022.7."[2]

■ Appellant assigns error to the concluding paragraph of the enhancement instruction. He contends the instruction effectively usurped the jury's function and directed a verdict on one of the statutory elements of the enhancement and, consequently, the instructional error is reversible per se. ■ ■ ■ ■ He asserts, "The impact of the court's instruction here was simply to obviate the need for the jury to consider the nature and magnitude of the injury, because the court told the jurors that the injury described by the victim satisfied the statutory requirement, and consequently appellant's trial by jury on the enhancement was effectively limited . . . ."[3]

---

[2] Penal Code section 12022.7 provides in relevant part: "Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which he is convicted.

"As used in this section, great bodily injury means a significant or substantial physical injury."

[3] The record clearly reflects that at trial appellant did not object to the instruction he now claims on appeal was erroneous. Nevertheless, appellant is not precluded from raising the issue here even though he did not object below. Any waiver exists only when, unlike here, there

We will conclude the court erred in instructing that "[a] bone fracture constitutes substantial and significant injury within the meaning of Penal Code section 12022.7."

The first three paragraphs of the enhancement instruction accurately communicate the jury findings required to satisfy the elements of Penal Code section 12022.7. The elements are: (1) the defendant had the specific intent to inflict great bodily injury on the victim, and (2) the defendant personally inflicted great bodily injury on the victim. (CALJIC No. 17.20 (1979 rev.).) The second paragraph correctly states it is the jury's duty and responsibility to weigh the evidence and determine if the elements are proved beyond a reasonable doubt.

However, by giving the concluding paragraph of the enhancement instruction, the trial court erroneously reduced the prosecution's burden of proving that Maria sustained great bodily injury under section 12022.7. The court in effect told the jury that if Maria sustained a broken bone, the great bodily injury element was satisfied as a matter of law. Although the court did not expressly direct the jury to find (1) that Maria sustained a broken bone or (2) that the great bodily injury element was satisfied as a matter of law, the concluding paragraph was nevertheless erroneous since it permitted the jury to find that element satisfied simply by concluding that Maria sustained a broken bone. This was error.

In *People* v. *Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680], the court held, in a prosecution for sale of unqualified securities, the trial court's instruction that certain promissory notes in evidence were securities under the Corporate Securities Law was tantamount to a directed verdict on the security element of the offenses. In reaching its conclusion the court dispelled notions that the trial court could so instruct (1) if the evidence left little room for doubt and/or (2) because the issue was solely a question of law.

The court summarized its holding by noting, "[T]he trial court's instruction here cannot stand. Instead of permitting the jury to find for itself that the note given [the victim] was a 'security'. . . , the trial court removed that issue from the jury and directed a finding on it. This was error, particularly

---

is "invited error." "[I]f defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find 'invited error'; only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause." (*People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153].)

As noted, no express "tactical purpose" can be gleaned from the present record regarding appellant's nonprotestation at trial of the subject great bodily injury instruction.

since it was not a foregone conclusion that the note . . . *was* a 'security' under the statute." (41 Cal.3d at p. 734, fn. omitted.)

Responding to the People's contention the instruction was justified, the court in *Figueroa* reasoned that if a judge were permitted to instruct the jury an element had been established due to supposedly undisputed evidence, the right to a jury trial would become a hollow guaranty. (41 Cal.3d at p. 730.) The court also explained that although the definition of a security is a matter of law, whether a particular document satisfies the definition is a question of fact. (*Id.* at pp. 730-734.)

The court based its holding on considerations of due process and the right to a jury trial. (41 Cal.3d at p. 731.) It concluded, "In many criminal cases, the prosecution's evidence will establish an element of the charged offense 'as a matter of law.' Similarly, in many instances, the accused will not seriously dispute a particular element of the offense. [Citation.] However, neither of these sometime realities of trial practice justifies the giving of an instruction which takes an element from the jury and decides it adversely to the accused. Such an instruction confuses the roles of judge and jury." (*Id.* at p. 733, fn. omitted.) The concurring opinion in *Figueroa* aptly summarized the majority holding when it stated "the majority distills an absolute rule that apparently would prohibit in criminal trials, regardless of the state of the evidence, such instructions as one that a particular automobile is a motor vehicle or one that a particular gun is a firearm." (*Id.* at p. 742.) The concurring justices preferred to postpone "such judicial rulemaking until the need arises." (*Ibid.*)

It has been observed that *Figueroa, supra,* 41 Cal.3d 714, articulated the following rules: "(1) No matter how conclusive the evidence, the court may not directly inform the jury an element of the crime charged has been established. (See *Konda* v. *United States* (7th Cir. 1908) 166 Fed. 91.)

"(2) The trial court determines what law applies to the charges to be deliberated by the jury, and to the extent possible, should state the law in 'abstract legal principles.' *(People* v. *Figueroa, supra,* 41 Cal.3d at p. 741.)

"(3) Absent a stipulation by defendant that an element of the crime has been established, or is admitted, the trial court must ' "go through the motions at least of submitting the issue to the jury even though the question appears . . . to be palpably lacking in factual character." ' (*Id.* at p. 727, fn. 15, citing *United States* v. *Austin* (10th Cir. 1972) 462 F.2d 724, 737.)

"(4) Even such a simple concept as 'a gun is a firearm,' must be conveyed to the jury in definitional terms so as to permit the jury to apply the

instruction in its factfinding/law-applying function." (*People* v. *Lawson* (1987) 189 Cal.App.3d 741, 747-748 [234 Cal.Rptr. 557].)

The instruction that "[a] bone fracture constitutes substantial and significant physical injury within the meaning of Penal Code section 12022.7" was tantamount to stating "a gun is a firearm" in nondefinitional terms.

This court, in *People* v. *Lawson, supra,* 189 Cal.App.3d 741, relied on *Figueroa* in concluding that the trial court's ruling that a particular instrument was a "security" within the meaning of violations charged under the Corporations Code was tantamount to a directed verdict on the security element of the offense and "amounted to prohibited factfinding by the court. . . ." (*Id.* at p. 754.)

The Attorney General argues "the instruction on 'bone fracture' was helpful and proper." He relies totally on *People* v. *Villarreal* (1985) 173 Cal.App.3d 1136, 1139-1140 [219 Cal.Rptr. 371].

In *Villarreal,* the defendant was convicted by a jury of assault by means of force likely to produce great bodily injury with a deadly weapon in violation of Penal Code section 245, subdivision (a)(1). The jury found true a great bodily injury allegation, within the meaning of Penal Code section 12022.7, based on multiple nasal fractures suffered by the victim in the attack. (*People* v. *Villarreal, supra,* 173 Cal.App.3d at pp. 1138-1139.) Appellant contended the trial court erred in instructing the jury that " '[a] bone fracture constitutes a substantial and significant physical injury within the meaning of Penal Code section 12022.7.' " (*Id.* at p. 1139.) The appellate court disagreed and affirmed the conviction, holding that the nasal fractures suffered by the victim constituted, as a matter of law, a substantial and significant physical injury within the meaning of Penal Code section 12022.7, and the trial court therefore properly so instructed the jury. (*Id.* at pp. 1139-1141.)

The Attorney General's reliance on *Villarreal* is misplaced. It was decided six months before *People* v. *Figueroa, supra,* 41 Cal.3d 714, and, as appellant correctly points out, "[n]o contention was made in *Villarreal* that the instruction violated the defendant's right to trial by jury, and *Villarreal* is not dispositive of the argument made here."

The recent Fourth District opinion of *People* v. *Nava* (1989) 207 Cal.App.3d 1490 [255 Cal.Rptr. 903] expressly contradicts *Villarreal* and concludes that "it was error in this case for the trial court to instruct the jury that a bone fracture was a significant and substantial injury within the meaning of section 12022.7." (*Id.* at p. 1498.) The court observed, "There

are 206 bones in the human body ranging in size from the femur of the leg to the ungual phalange of the little toe. (Gray, Anatomy of the Human Body (26th ed. 1954) p. 119.) Bone fractures are also variable, ranging from compound fractures of major bones to hairline fractures of very small ones. At their worst, fractures may be life threatening and cause crippling injuries; at their least, they may cause nothing more than frantic jumping—the result of a toe stubbed against an unmoving chair leg. The point is that bone fractures exist on a continuum of severity from significant and substantial to minor." (*Id.* at p. 1496.)

We must now determine whether the enhancement instructional error is subject to the review standard of "reversible per se" or "harmless beyond a reasonable doubt" as articulated in *Chapman v. California* (1967) 386 U.S. 18, 21 [17 L.Ed.2d 705, 708-709, 87 S.Ct. 824, 24 A.L.R.3d 1065].

In *Figueroa,* the court noted: "[I]nstructions like the one given here may not always constitute prejudicial error. While reversal of the judgment for the error discussed in Part II of this opinion renders it unnecessary to decide what standard of prejudice should be used to assess the trial court's instruction, today's opinion should not be read as compelling a reversal in every case in which similar instructions were given. (Cf. *People v. Garcia, supra,* 36 Cal.3d at pp. 550-557.)" (*People v. Figueroa, supra,* 41 Cal.3d at p. 734, fn. 24; see also *People v. Lawson, supra,* 189 Cal.App.3d 741, 754.)

In *People v. Odle* (1988) 45 Cal.3d 386, 415 [247 Cal.Rptr. 137, 754 P.2d 184], the Supreme Court concluded that the trial court's failure to instruct the jury on an element of a special circumstance—that defendant " 'knew or reasonably should have known that his victim was a peace officer engaged in the performance of his duties'—was harmless beyond a reasonable doubt" under *Chapman v. California, supra,* 386 U.S. 18 and, therefore, not reversible error.

*Odle* relied on *Cabana v. Bullock* (1985) 474 U.S. 376 [88 L.Ed.2d 704, 106 S.Ct. 689] in concluding that a defendant does not have a federal constitutional right to have all elements of a special circumstance determined by a jury. "The decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury. Indeed, in *Spaziano v. Florida,* 468 U.S. 447 (1984) [82 L.Ed.2d 340, 104 S.Ct. 3154], we specifically rejected the argument that the Sixth Amendment or any other constitutional provision provides a defendant with the right to have a jury consider the appropriateness of a capital sentence." (*Cabana v. Bullock, supra,* 474 U.S. 376, 385-386 [88 L.Ed.2d 704, 716].)

*Odle* reaffirmed the exceptions to a reversible per se standard for federal constitutional error as set forth in *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826]: "(i) If the erroneous instruction was given in connection with an offense of which the defendant was acquitted and had no bearing on the offense of which he was convicted; (ii) If the defendant conceded the issue; (iii) If the factual issue posed by the omitted instruction was necessarily resolved adversely to the defendant under other properly given instructions . . . ; or (iv) If the parties realized the element was in issue, presented all the evidence at their command on the issue, and the record both established the existence of the element as a matter of law and showed the contrary evidence not worthy of consideration (the '*Cantrell-Thornton* exception' (*People* v. *Cantrell* (1973) 8 Cal.3d 672 . . . ; *People* v. *Thornton (*1974) 11 Cal.3d 738 . . . .)" (*People* v. *Odle, supra,* 45 Cal.3d at pp. 410-411.)

The court in *Odle* reviewed the record and observed, "In our view, these circumstances show conclusively that at a minimum, defendant reasonably should have known Swartz was a peace officer engaged in the performance of his duties. It would, indeed, require fantastic speculation on our part to hold that a reasonable jury could have found otherwise. We therefore conclude that the failure to instruct on the special circumstance was harmless under *Chapman*. It follows that it was also harmless under *Watson, supra,* 46 Cal.2d 818, 836 [299 P.2d 243]." (*People* v. *Odle, supra,* 45 Cal.3d at p. 416.)

In *Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], the Supreme Court found harmless instructional error impermissibly shifting the burden of proof on the issue of malice in a murder trial. Noting that errors subject to a reversible per se standard are the exception rather than the rule, the court said: "We have emphasized . . . , that while there are some errors to which *Chapman* does not apply, they are the exception and not the rule. [Citation.] Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless- error analysis. The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments. Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed. As we have repeatedly stated, 'the Constitution entitles a criminal defendant to a fair trial, not a perfect one.' [Citations.]" (*Rose* v. *Clark, supra,* 478 U.S. at pp. 578-579 [92 L.Ed.2d at p. 471].)

The United States Supreme Court, in *Pope* v. *Illinois* (1987) 481 U.S. 497 [95 L.Ed.2d 439, 107 S.Ct. 1918], held that even instructional error

pertaining to an element of an offense may be subject to the harmless error standard of *Chapman*. In a prosecution for sale of obscene materials, the trial court's community standards instruction regarding value violated the objective standard constitutionally required. Nevertheless, the court held there was "no reason to require a retrial if it can be said beyond a reasonable doubt that the jury's verdict . . . was not affected by the erroneous instruction." (*Id.* at p. 502 [95 L.Ed.2d at p. 446].) The court concluded, "While it was error to instruct the juries to use a state community standard in considering the value question, if a reviewing court concludes that no rational juror, if properly instructed, could find value in the magazines, the convictions should stand." (*Id.* at p. 503 [95 L.Ed.2d at p. 447], fn. omitted.)

The court evaluated the effect of the erroneous instructions in *Pope* and *Rose,* as follows: "The problem with the instructions in both cases is that the jury could have been impermissibly aided or constrained in finding the relevant element of the crime: in *Rose,* by the erroneous presumption; in this case, by possible reliance on unreasonable community views on the value question. By leaving open the possibility that petitioners' convictions can be preserved despite the instructional error, we do no more than we did in *Rose*. To the extent that cases prior to *Rose* may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof, . . . , after *Rose,* they are no longer good authority." (*Pope* v. *Illinois, supra,* 481 U.S. at pp. 503-504, fn. 7 [95 L.Ed.2d at p. 447].)

■ Although the instruction in the instant case did partially invade the province of the jury as to an element of the enhancement, the standard of review for the error is "harmless beyond a reasonable doubt" under *Chapman* v. *California, supra,* 386 U.S. at page 21 [17 L.Ed.2d at pages 708-709]. (*People* v. *Odle, supra,* 45 Cal.3d at p. 415.) ■ Maria testified without contradiction about the shattered bone in her arm, the flesh wounds to her arm and face, and the five surgeries, including a bone graft, resulting from this vicious attack. Appellant did not in any way dispute the nature or extent of Maria's injuries. Under the facts of this case it is inconceivable that the jury, without receiving the erroneous instruction, would have concluded Maria did not sustain "great bodily injury." (Pen. Code, § 12022.7; CALJIC No. 17.20 (1979 rev.).) There is no evidence in the record to support a finding that Maria's physical injuries were anything but "significant or substantial" within the meaning of section 12022.7. Therefore, there was no material issue of fact relative to Maria's injuries for the jury to determine, and the instructional error was harmless. (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267].)

Additionally, the jury resolved all but one of the Penal Code section 12022.7 enhancement elements adversely to appellant by its attempted first degree murder verdict, which was clearly unaffected by the erroneous instruction. Through that verdict the jury found beyond a reasonable doubt that appellant was the person who attacked Maria and that he specifically intended to kill her. This latter finding goes well beyond the element in section 12022.7 that he specifically intended to inflict great bodily injury. The only enhancement element not determined by the attempted murder conviction was whether Maria sustained "great bodily injury." All the evidence says she did.

■ Application of the harmless error rule here will "promote[ ] public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 681 [89 L.Ed.2d 674, 685, 106 S.Ct. 1431].) The enhancement findings against appellant should not be set aside.

IV.*

. . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Best, Acting P. J., and Pettitt, J.,† concurred.

A petition for a rehearing was denied June 21, 1989, and appellant's petition for review by the Supreme court was denied August 9, 1989.

---

*See footnote, *ante*, page 1295.
†Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.