[No. D011281. Fourth Dist., Div. One. Jan. 7, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERTO GODINEZ, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part V.

**COUNSEL**

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Keith I. Motley and Patti W. Ranger, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FROEHLICH, J.**—By an information, Roberto Godinez (Godinez) was charged with the murder of Antonio Servin Segura (the victim). It was

further alleged Godinez personally used a knife in committing the murder, in violation of Penal Code section 12022, subdivision (b). A jury convicted Godinez of voluntary manslaughter, but found untrue the allegation he personally used a knife. Godinez was sentenced to the midterm of six years.

Godinez raises several contentions on appeal. First, he claims the trial court prejudicially erred in its instruction to the jury explaining that homicide is a reasonable, natural and expected consequence of a gang attack. Second, he argues there was insufficient evidence indicating the homicide was a reasonable and natural consequence of the gang attack in which he participated. Third, he claims the trial court erred in ruling that his admissions to police were voluntary. Finally, he claims his counsel was ineffective for having introduced the tape-recorded admissions into evidence.

Our independent review of the admissions leads us to conclude they were voluntary. However, we find, from a review of the *entirety of the evidence*, that although there was sufficient evidence from which a jury could have concluded the homicide here was a natural and reasonable consequence of the gang assault on the victim, there was also a reasonable possibility the jury could have reached the opposite conclusion. We therefore conclude the trial court's instruction was prejudicially erroneous, and accordingly must reverse.[2]

I. *Factual Background*

A. *The Prosecution's Case*

Cesar Ibanez, Manuel Sandoval and the victim were members of a gang known as the Old Town National City Insane Boys (O.T.N.C.). As they were heading home on the evening of January 29, 1988, Ibanez, accompanied by Sandoval and the victim, drove into a gas station located in an area of San Diego known as "Shelltown"—an area "claimed" by a rival gang known as the "Shelltown Gamma Boys" (Shelltown).

Although the O.T.N.C. and Shelltown gangs were enemies, and fights occurred when one gang was found on another gang's turf, Ibanez and Sandoval did not go into the gas station looking for a fight. Ibanez had purchased gas from the same station on several prior occasions and had never seen any members of the Shelltown gang around the station. He would not have stopped there had he seen Shelltown gang members at the station.

Both Ibanez, who was walking with an intent to pay for gas, and Sandoval, who remained in the car, saw a male (whom Sandoval identified as

---

[2]In light of our disposition, it is unnecessary to reach the "ineffective assistance of counsel" argument.

Godinez) dressed in a jacket bearing the Shelltown colors standing by some air pumps and "throwing hand signs" (giving hand signals). Standing next to Godinez was another Shelltown gang member. Both Ibanez and Sandoval recognized the signs as indicating Godinez's membership in the Shelltown gang and, because they were on Shelltown turf, interpreted the signs as a challenge to fight. Realizing that trouble was imminent, and suspecting there were other Shelltown gang members nearby ready to help Godinez if trouble occurred, Ibanez abandoned the idea of getting gas, returned to his car and began driving away.

As Ibanez drove away, Godinez, who was still "throwing hand signs," ran after the car. The victim, who was inside the car, yelled out "Insane Boys Gang O.T.N.C." and also gave his own hand signs, indicating he accepted the challenge to fight. Ibanez had to slow down for a red light at a nearby intersection. As he slowed down, the victim and Sandoval jumped from the car and ran toward Godinez and the other Shelltown member. Knowing a fight would ensue, Sandoval accompanied the victim to back him up.

As the victim and Sandoval moved toward Godinez and his associate, approximately five more members of Godinez's gang came running to join the fray. Although Sandoval had initially intended to fight, when he saw they were outnumbered he yelled at the victim to run, and Sandoval retreated to Ibanez's car. By the time the victim realized he was outnumbered and tried to retreat, it was too late—he had been surrounded by Shelltown gang members. Sandoval claimed Godinez started the fight by punching the victim in the face, causing him to fall to the ground. The people surrounding the victim began kicking and punching him as he lay facedown on the ground. Although none of the four eyewitnesses saw any knives being used, one eyewitness testified the motions of two of the Shelltown gang members were consistent with use of a knife.

Sandoval retreated to the car to search for a weapon to equalize the mismatched fight. The sound of an approaching siren, however, caused the Shelltown gang members surrounding the victim to retreat and climb into a van. One member of the retreating force (identified by Sandoval as Godinez) returned to administer another kick to the victim, who was still lying on the ground. Another witness stated, however, the returning member also made stabbing motions on the prostrate victim, although the witness did not see a knife. That gang member then returned to the van.

Sandoval had returned to the car and steered it toward other Shelltown gang members in an attempt to hit them and to stop the van from fleeing. As Sandoval drove up, Godinez threw a bottle at the car, smiling and laughing

at Sandoval. Godinez and the rest of his group then successfully boarded the van and fled the scene.

Ibanez and Sandoval then tried to help the victim into the car. At that point they realized the victim was bleeding from stab wounds. Before they could transport the victim anywhere, police arrived and took over, with paramedics then arriving to transport the victim to the hospital. The victim was pronounced dead at the hospital.

Godinez was arrested the following morning and, after waiving his *Miranda* rights, interrogated concerning the crime.

### B. *The Prosecution's Experts*

Medical testimony revealed that in addition to the multiple injuries suffered from punches and kicks, the victim suffered seven stab wounds. Any one of the three stab wounds, involving injury to the lungs, heart and spleen, could have been fatal. Death was attributed to massive loss of blood from the multiple stab wounds.

Detective Aguirre, the prosecution's gang expert, testified about the gang subculture, including the various indicia of gang membership, such as tattoos, clothing, association with gang members, and outright "claims" of gang membership. He also discussed the use of hand signs and words in communicating membership and challenges, as well as the territorial aspects of gangs.

Aguirre testified that not all gangs are rivals of all other gangs, but when two members of rival gangs meet there usually is a violent confrontation, especially if one gang is in another's territory and is outnumbered. He indicated there is a rivalry between the Shelltown and the O.T.N.C. gangs, which has resulted in violent confrontations in the past.

When a challenge is issued, the challenged gang must accept it or lose face. Aguirre indicated that when a rival gang drives by and shouts a challenge, the "usual" result is a shooting, fight or some other act of violence. However, he did not specifically testify deaths are a usual, or even frequent, result of such challenges, nor did he present statistical evidence concerning the frequency with which gang fights resulted in deaths.

Aguirre testified gangs also have a social (not just antisocial) aspect, and that not all persons who "claim" gang membership are in fact hard-core members but may instead be peripheral members who only associate with

the gang for its social aspects. However, social participants could neverthe-less find themselves in the middle of a fight. He also indicated that Shell-town gang members have expressed a desire to resolve differences with other gangs and lead a hassle-free life, but noted that even those who profess such attitude still find themselves in violent, sometimes brutal, confronta-tions.

## C. *Defense Evidence*

The defense's case revolved principally around Godinez's claim that he was not the actual "stabber," and that he was only marginally involved in the fight with the victim. Godinez testified he had been a member of Shelltown, the rival to the O.T.N.C. gang, and that his gang was active in many social functions, such as parties, dances and football games. He also indicated his gang did not rival all other gangs but generally tried to make peace with them. Although Godinez was aware of the rivalry between the Shelltown and O.T.N.C. gangs, he had never been involved in or seen any fights between the two groups, nor had he ever been involved in any other gang fights. Godinez also testified that "throwing signs" does not always mean a chal-lenge to fight, explaining that such gang signs can be a form of greeting and recognition.

On the night of the incident, Godinez was with four Shelltown gang members and four girls. They were in a van getting gas at the station where the incident occurred. Godinez was standing outside the van when Ibanez drove up in his car. When Godinez next noticed the car, someone was walking toward it. Godinez then saw someone stick his head out the window and wave, but did not interpret the gesture as a gang sign. Godinez re-sponded with the Shelltown sign, only to identify himself, not to represent a challenge.

After the car pulled away, Godinez saw the victim emerge from the car. The victim then began arguing with Godinez about gangs. He walked quickly toward Godinez, carrying something in his hand, as if wanting to fight. The victim was also throwing signs as if to challenge a fight. He swung at Godinez, cutting Godinez's hand. Godinez then took several steps backward and dropped to the ground to nurse his wound. When Godinez looked up, he saw several Shelltown gang members pursuing the victim. The group caught the victim, pushed him to the ground and began hitting and kicking him. Godinez moved toward the group to join the fray. He never reached the group, however, because the gang ran away when police approached.

Godinez testified he neither had an intention of getting into a fight that night nor of getting into a fight with the victim until after the victim attacked

him. Godinez claimed he did not have a knife, did not know his fellow gang members had knives, and did not know the victim had been stabbed. He also claimed he did not kick, punch or stab the victim, and he was the only Shelltown gang member who did not participate in the attack.

## II. *The Verdict and Sentence*

The jury acquitted Godinez of first and second degree homicide, but found him guilty of the lesser included offense of voluntary manslaughter. It also found untrue the allegation that Godinez personally used a knife during the attack. Godinez's motions to reduce the offense and for a new trial were denied. He was sentenced to the midterm of six years.

## III. *There Was Substantial Evidence to Support a Jury Finding That the Homicide Was a Natural and Reasonable Consequence of the Gang Attack*

We evaluate the evidence based on aider and abettor principles, because it appears Godinez was convicted as an aider and abettor, rather than as the actual perpetrator of the stabbing which caused the death.[3] The parties agree the liability of an aider and abettor is not limited to the target crime which he knowingly and intentionally aids and encourages, but can include crimes committed by the perpetrator which are natural and reasonable consequences of the criminal course of conduct the aider and abettor knowingly aids and encourages. (*People* v. *Jones* (1989) 207 Cal.App.3d 1090, 1095-1096 [255 Cal.Rptr. 464].) It is now settled that it is a question of fact whether the charged offense was a natural and reasonable consequence of the target offense knowingly encouraged, and the jury should be instructed of its responsibility to determine this factual issue. (*People* v. *Hammond* (1986) 181 Cal.App.3d 463, 469 [226 Cal.Rptr. 475].)

Godinez argues there was no substantial evidence the homicide was a natural and reasonable consequence of the gang attack upon the victim because (1) the prosecution's expert did not specifically state that homicides occurred during gang attacks; (2) no witness saw any knives; (3) Godinez denied participating in the attack; and (4) he denied knowing his fellow members had knives.

However, the record as a whole provided substantial evidence from which a reasonable jury *could* have found the homicide was a natural consequence

---

[3]At trial the People's lead argument was that appellant was guilty as an aider and abettor. On appeal the People do not seriously argue that the jury convicted appellant as the perpetrator. Moreover, the jury's verdict shows it was unconvinced appellant actually stabbed the victim, since it found untrue the "personal use of a knife" allegation.

of the gang attack which Godinez aided and encouraged. There was ample evidence, and inferences drawable therefrom, upon which to conclude that Godinez's denial of participation in the attack and denial of knowledge of knives lacked credibility. One witness identified him as a participant in, and indeed as the instigator of, the attack. There was little doubt the attackers in fact used at least one (if not more than one) knife, given the seven stab wounds suffered by the victim. Godinez admitted having associated with the gang members for several years, and further admitted riding around in a van with the attackers for several hours before the assault, permitting an inference he was aware they possessed knives that night. The jury could also have rejected the credibility of Godinez's denial of knowledge of knives simply based upon Godinez's own admissions that he lied under certain circumstances.[4]

Moreover, although the police expert did not specifically link "homicides" with gang confrontations, he did state that he had seen rival gangs issue "drive-by" challenges, and the usual result was a shooting, fight or other violent act. Indeed, when a "drive-by" challenge is shouted by a rival, people dive for cover fearing a shooting will occur. He testified that anytime rivals meet, a violent confrontation is strongly possible, especially if one gang is in the rival's territory and outnumbered. When there is a gang confrontation, he stated, it is violent and can be "very brutal." Based on this testimony and the common knowledge that an unfortunate reality of modern times is that gang confrontations all too often result in death (which jurors are entitled to consider), there was ample evidence from which a jury could have found the homicide was a natural consequence of the gang attack Godinez aided and encouraged.

## IV. The Trial Court Prejudicially Erred in Instructing the Jury That Homicide Is a Natural and Reasonable Consequence of a Gang Attack

 Even though a jury *could* have found the homicide a natural consequence of the gang attack, Godinez argues reversal is required because the jury was effectively instructed that it *must* find the homicide to be such a natural consequence. The aider and abettor instruction, to which Godinez objected, stated:

"The persons concerned in a commission of a crime who are regarded by law as principals in the crime thus committed and equally guilty thereof

---

[4]When Godinez was originally questioned by police, he claimed he was in Tijuana on the night of the incident. His story later evolved into having been at the site of the incident, alone, and having cut his hand several days earlier while climbing over a fence. It then evolved into admitting the victim had come at him and cut him with the knife but the people who came to his aid were not from the group with whom he had been riding. At trial he admitted telling the police several stories, none of which was the story he related in court.

include, one, those who directly and actively commit the act, executing the crime, or [¶] [t]wo, those who aid and abet the commission of the crime.

"One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and probable consequences of any act that he knowingly and intentionally aided or encouraged. It is for you, the jury, to determine whether the defendant is guilty of the crime allegedly committed —excuse me—allegedly contemplated and, if so, whether the crime charged was a natural and probable consequence of the criminal act knowingly and intentionally encouraged.

"*Homicide is a reasonable and natural consequence to be expected in a gang attack*, though it is not necessary to show that one was aware that any of his co-assailants possessed deadly weapons." (Italics added.)

 ██ ██ The italicized portion, Godinez claims, is erroneous under any one of several theories: (1) It was tantamount to a directed verdict; (2) It created an impermissible mandatory presumption; or (3) It deprived the jury of its factfinding role by removing an issue from its consideration, i.e., by presuming homicide is a natural consequence of gang attacks.[5]

A. *The Instruction Was Erroneous*

 "The critical element which must be found to establish vicarious [i.e., aider and abettor] liability for an unplanned offense is that the [unplanned] offense was in fact a natural and probable consequence of the

---

[5]Godinez also attacks the last clause of the instruction by arguing that, as a matter of law, aiders and abettors cannot be liable for homicides unless there is proof they knew their confederates possessed a weapon. He relies on *People* v. *Butts* (1965) 236 Cal.App.2d 817 [46 Cal.Rptr. 362] for this proposition. Our review of *Butts* reveals it is at best unsupported by any law, and at worst inconsistent with subsequent authority. Regarding the former defect, *Butts* reached its conclusion after citing *People* v. *Cayer* (1951) 102 Cal.App.2d 643 [228 P.2d 70], ignoring the fact that *Cayer*'s holding was precisely the *opposite*: it upheld aider and abettor liability for a homicide in which the actual perpetrator killed the victim without use of a weapon. (*Id.* at p. 651.) Regarding the latter defect, *Butts* stated aider and abettor liability for a homicide required the defendant to advise and encourage actual use of, or to share the perpetrator's intent to use, the knife, or to have had advance knowledge of the intended use of the knife. (236 Cal.App.2d at p. 836.) That is *not* the mens rea of an aider and abettor: The only requirement is that defendant share the intent to facilitate the *target* criminal act and that the crime committed be a foreseeable consequence of the target act. (*People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)

We conclude that, although evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of a homicide, it is not a necessary prerequisite. (See also *People* v. *Le Grant* (1946) 76 Cal.App.2d 148, 152-154 [172 P.2d 554] [where death is reasonable and natural consequence of assault with fists, aider and abettor liability for involuntary manslaughter upheld despite no use of deadly weapon].)

targeted offense" (*People* v. *Jones, supra,* 207 Cal.App.3d at p. 1096), and this determination is a factual one for the jury (*People* v. *Hammond, supra,* 181 Cal.App.3d at p. 469). The instant instruction usurped the factfinding role of the jury by explaining that homicides are in fact reasonable and natural consequences of gang attacks, rather than leaving to the jury the question of whether the homicide here was a natural and reasonable consequence of the gang attack Godinez aided and abetted. Instructions have been deemed erroneous which deprive a defendant of the right to have the jury determine the relevant factual issues. (*People* v. *Hedgecock* (1990) 51 Cal.3d 395, 407-409 [272 Cal.Rptr. 803, 795 P.2d 1260]; *People* v. *Figueroa* (1986) 41 Cal.3d 714, 724 [224 Cal.Rptr. 719, 715 P.2d 680].)

Numerous courts have declared erroneous a variety of instructions which, like the instant one, have deprived the jury of its factfinding role by declaring that certain factual questions have been established. In *People* v. *Nava* (1989) 207 Cal.App.3d 1490, 1498 [255 Cal.Rptr. 903], and again in *People* v. *Beltran* (1989) 210 Cal.App.3d 1295, 1303 [258 Cal.Rptr. 884], the courts concluded it was improper to instruct a jury that a bone fracture constitutes a substantial and significant injury within the meaning of a sentencing enhancement, because such factual question must be left to the jury. The court in *People* v. *Jarrell* (1987) 196 Cal.App.3d 604, 607 [242 Cal.Rptr. 219] and in *People* v. *Hutchins* (1988) 199 Cal.App.3d 1219, 1221-1222 [245 Cal.Rptr. 541] concluded it was improper to instruct the jury that if it found the defendant guilty, it must fix the degree of the crime as first degree. In each of these cases the court concluded that, no matter how strong the evidence, it is error for the court to deprive the defendant of the right to a jury determination of relevant factual issues.

The People contend it was not improper for the court to give this instruction, arguing that our Supreme Court's holding in *People* v. *Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135] demonstrates that instructions on a "point not open to dispute" do not improperly deprive the jury of its factfinding function. However, the *Brown* court approved an instruction which merely explained a point of law: that as a matter of law members of a certain police department were "peace officers" within the meaning and scope of a statutory enhancement. (*Id.* at pp. 443-444 and fn. 6.) While statutory interpretation may present a question of law not open to dispute, we cannot agree that a court may conclude as a matter of law that homicide is *always* a foreseeable consequence of any gang attack.[6]

Because the instruction was erroneous, we must evaluate whether the error was prejudicial.

---

[6]The People insist that *People* v. *Montano* (1979) 96 Cal.App.3d 221 [158 Cal.Rptr. 47] and the findings of the Legislature in Penal Code section 186.21 show that homicide is as a matter of law a foreseeable consequence of a gang attack. Neither authority stands for that

## B. The Error Is Not Harmless Beyond a Reasonable Doubt

Godinez insists that per se reversal is required because the error deprived him of his right to a jury trial, rendering the trial "fundamentally unfair" within the meaning of *Rose* v. *Clark* (1986) 478 U.S. 570, 577 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101]. He alternatively argues that, at a minimum, the error must be tested under the "harmless beyond a reasonable doubt" standard articulated in *Chapman* v. *California* (1967) 386 U.S. 18, 21 [17 L.Ed.2d 705, 708-709, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Such standard, the People insist, must be applied if error is found.

■ There appears to be some uncertainty over which standard is applicable to instructions, such as the subject instruction, which are viewable either as creating a presumption or as partially directing a verdict on an issue the People must prove. (See *People* v. *Nava, supra,* 207 Cal.App.3d at p. 1498, fn. 3.) "Generally, when a trial court instructs the jury that an element of the offense charged is conclusively presumed, the effect of the error appears to be measured by the 'harmless beyond a reasonable doubt' standard set forth in [Chapman] . . . . But when the error renders the trial 'fundamentally unfair,' the error is reversible per se." (*People* v. *Hedgecock, supra,* 51 Cal.3d 395, 410.) We are not required to decide definitively which standard is applicable, because, even under *Chapman,* we are not convinced beyond a reasonable doubt the error was harmless.

To determine whether an error is harmless under *Chapman,* we must decide whether there is a reasonable possibility the error might have contributed to the conviction. (*People* v. *Powell* (1967) 67 Cal.2d 32, 56-57 [59 Cal.Rptr. 817, 429 P.2d 137].) Even though, as we concluded above, a jury could have found the homicide was a reasonable and natural consequence of the gang attack, if a reasonable jury could have reached a contrary conclusion, the error is prejudicial under *Chapman.* (*People* v. *Nava, supra,* 207 Cal.App.3d at p. 1499.)

■ On the facts of this case it is reasonably possible a jury might have concluded the victim's death was not a reasonable and natural consequence

proposition. In *Montano* the issue was whether the trier of fact was justified in finding, *as a matter of fact,* the homicide was a natural consequence of a gang attack; the court concluded the facts of the case, including the frequency with which such attacks result in homicide, justified the factual determination. (*Id.* at p. 227.) Legislative "findings" do not support the People's position. The cited section only finds that numerous gangs exist and the number of gang-related murders is increasing. However, the murders are not categorized as to what percentage involves ambushes, drive-by shootings or retaliatory shootings versus what percentage involves deaths from gang fights during chance encounters, nor is there a determination that murder as a matter of law is a foreseeable consequence of gang fights.

of the attack Godinez aided and abetted. There was no evidence (statistical or otherwise) regarding the probabilities or frequencies of chance encounters between gangs resulting in fights causing death. The prosecution's expert did not testify that homicide is a natural consequence of a gang attack. Although he testified some encounters do result in brutal fights, he did not testify such fights always, frequently, or even occasionally result in the death of a participant.

Moreover, the evidence suggested this was a chance encounter rather than a planned ambush, permitting an inference the participants' objectives during the fight were originally limited to administering merely a mild beating to establish turf dominance, and the escalation was not a reasonably foreseeable consequence of the initial fight. Godinez testified he did not know his associates were carrying knives. If the jury credited this testimony,[7] it could have concluded the fatal stab wounds were not a reasonably foreseeable consequence of the fight he knowingly encouraged—a fight between unarmed combatants. Indeed, despite his membership for several years in the Shelltown gang, he testified he had never been involved in or seen any fights between Shelltown and O.T.N.C. or any other gangs, permitting an inference that homicide was not reasonably foreseeable.

The harmful effect of the instruction was magnified by the prosecution's closing argument. The prosecution made no effort to convince the jury this homicide was in fact a reasonable and natural consequence of the "target offense"—the gang attack on the victims. To the contrary, on several occasions it seized upon the instruction to stress that the law *declares* homicide to be a foreseeable consequence of a gang attack, and the only required showing was Godinez's participation in a gang attack on the victim.[8]

Finally, we note this was not an open-and-shut case: The jury deliberated for several days, during which time it requested rereading of certain testimony and a chance to view certain exhibits. It is significant, moreover, that

[7]Although we have previously explained why the jury could have discredited Godinez's testimony (see *People* v. *Nava, supra,* 207 Cal.App.3d at pp. 1498-1499, fn. 3), a jury could also have accepted his explanation for his prior falsehoods and viewed him as currently telling the truth.

[8]The pernicious impact of the presumption created by the instruction surfaced again during the prosecution's rebuttal. During the defense's closing argument counsel argued that aider and abettor liability should not result here, anymore than in the analogous case where a husband or wife gets into a heated argument with a victim and the other spouse comes to the defense and ends up stabbing the victim. The prosecution, arguing this analogy was irrelevant, stated: "The law doesn't say that there is a reasonable and natural consequence of homicide when a husband and wife get in a fight with somebody . . . . [¶] What the law says is that homicide is a reasonable and natural consequence to be expected from a gang attack, and that is what this is, a gang attack."

the jury *acquitted* Godinez of personally using a knife, and during its deliberations asked the court to reread instructions and answer questions concerning the extent of aider and abettor liability. The inference is compelling that appellant was convicted upon a finding of aider and abettor status.

Under these circumstances we cannot conclude that removing from the jury's purview the factual question of whether the homicide was a natural and reasonable consequence of a gang attack was harmless beyond a reasonable doubt. Accordingly, we must reverse.

## V. *The Confession Was Properly Admitted as a Voluntary Confession**

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

## VI. *Conclusion*

We conclude the admissions were not coerced and there was sufficient evidence from which a jury could have found, as a factual matter, the homicide was a natural and reasonable consequence of the gang attack. However, because the jury could also have reached the contrary conclusion, but the instruction erroneously removed this factual issue from its purview, reversal is required.

### DISPOSITION

The judgment is reversed.

Work, Acting P. J., and Nares, J., concurred.

---

*See footnote 1, *ante*, page 492.