[No. F025271. Fifth Dist. Nov. 14, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD EVANS MOORE, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

_____

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I.

**COUNSEL**

Karen L. Landau, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Harry Joseph Colombo and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

ARDAIZ, P. J.—Appellant Donald Evans Moore stands convicted, following a jury trial, of conspiracy to misappropriate public funds (Pen. Code,[1] §§ 182, subd. (a)(1); 424, subd. 1; count 1), conspiracy to obtain money by false pretenses (§ 182, subd. (a)(4); count 2), and grand theft by false pretenses (§ 487, subd. (a); count 3). The jury further found that the funds taken exceeded $150,000 within the provisions of section 12022.6, subdivision (b), and $100,000 within the provisions of section 1203.045, subdivision (a). Following denial of his motion for new trial, appellant was sentenced to a total unstayed term of five years in prison and ordered to pay a $200 restitution fine. After a further hearing, he was ordered to pay restitution in the amount of $200,118.63. This timely appeal followed.

### FACTS

Prior to January 1994, Dennis Stowe was the superintendent of the Lost Hills Water District (LHWD or the district). His responsibilities encompassed repairing and maintaining the system, including purchasing equipment and arranging for its installation. As of November 1993, Danny Howard was a maintenance foreman with the district. His duties included overseeing employees who were doing repair work and operations. Stowe was Howard's immediate supervisor; Phillip Nixon, manager of LHWD, was Stowe's immediate supervisor.

In November 1993, Verta Rolin, who worked in LHWD's business office, brought it to Howard's attention that certain materials may not have been delivered. She showed him some invoices, after which Howard checked to see if the items had been installed. He then contacted Nixon. The two discussed the invoices, which were from SMS Industrial Supplies and were for items that would be used in the repair of the LHWD system. Howard told Nixon that the merchandise was not there and that something suspicious was going on.

Nixon examined the district's records of past expenditures. Generally, the invoices bore a listing of the location of the items so that LHWD would know where the work was being done. The invoices would come in from the businesses from which the supplies were being purchased. Stowe would receive the invoices, note where the repairs were being performed, sign the invoices to show that the goods were received, and then route them to the administrative office in Bakersfield. Nixon would review the invoices, which would then go to accounts payable. Checks would be prepared; the

---

[1]All statutory references are to the Penal Code unless otherwise stated.

board of directors would vote on the payments at their monthly meeting; and checks would then be issued. Based on the invoices received, checks were issued to SMS and D. E. Moore between January 1991 and December 1993. Most of these invoices were handwritten, although a few were computer-generated. Appellant owned both businesses.

Nixon later met with Howard and looked at several different locations that were noted on the invoices. He did this to see if the items listed on the invoices had been received at a particular site. The materials shown on the invoices were not there. During 1991 through 1993, if a canal gate or canal turnout had been repaired in the district, Howard would have been involved. Everything had to go through Stowe to be ordered; Howard would have been the one to request such an order. It would have been impossible for Stowe to have replaced four or five canal gates without Howard's knowledge. Howard did not ask Stowe to replace canal gates as shown on the invoices, nor were any in need of replacement.

Where canal gates were involved, the sites in question all had Waterman gates and the invoices bore Waterman's part codes. Waterman Industries is a wholesaler that sells mainly to distributors. It had no records of selling anything to SMS or D. E. Moore between December 1990 and December 1993. However, it did have records showing the sale of canal gates to Courtesy Pneumatic. LHWD had purchased canal gates from Courtesy Pneumatic in the past. Howard never saw any sort of canal gate or Waterman parts delivered to the district by appellant.

Some of the items supposedly sold to LHWD were very heavy and would have required a large truck to move and a forklift to unload.[2] Verta Rolin only saw appellant deliver small items that he carried in his pickup truck. She never saw him with a larger truck. Appellant would have been unable to haul Waterman canal gate parts in his truck. Howard never saw him deliver many of the items listed on the invoices. However, Howard admitted that he did not have knowledge of everything that was delivered to the district.

Kenneth Sawtelle worked for appellant at appellant's business, SMS Industrial and Welding Supplies. The business carried agricultural supplies with an emphasis on welding. It never sold canal gates. Sawtelle set up computerized inventory and accounts receivable and payable systems for the business. All invoices were printed out from the computer. Even assuming a

---

[2]Some manufacturers will "drop ship" large items to the customer's jobsite. It would not be unusual for a customer to request this of the manufacturer.

customer's order was written up by hand, it would be entered into the computer as an invoice and printed up.[3]

At some point, appellant wanted Sawtelle to fill out, by hand, blank invoice forms. Sawtelle observed other people in the office filling out the forms. The idea was to copy some part numbers onto the forms from some type of list.[4] Sawtelle refused to participate and left the company in early 1991.

From late 1991 or early 1992, Laurie Hooker was involved with SMS Industrial Lime Sales. From 1992 to March of 1993, she was also employed by Hooker Brothers Automotive, which was owned by her uncles and father. She was the bookkeeper/secretary. From 1992 through March of 1993, Hooker Brothers shared space with appellant, whose business was SMS Industrial and Welding Supplies. Laurie Hooker never worked for that business. In March of 1993, Hooker Brothers moved to a different location. Appellant's business also moved to the new location.

Laurie Hooker owned SMS Industrial Lime Sales, which did marketing and distribution of lime. Larry Hooker (her father), Jim Hooker (her uncle) and appellant were the other officers of the corporation. Appellant was the chief executive officer or president, but Laurie Hooker owned all of the company's stock at the time. Laurie Hooker drew a salary of $300 per month from the company. That was her only compensation. According to Larry Hooker, SMS Industrial Lime Sales did not show much profit over the three years in question. Larry Hooker had taken about $10,000 in draw since 1992, and did not know the gross volume of business for the company. He was unaware in 1992 or 1993 that approximately $85,000 was written in checks to Dennis Stowe and James Van Pelt on SMS Industrial Lime Sales checking accounts. However, it was not his responsibility to pay the bills, so he did not know what jobs the checks may have been for.

Laurie Hooker signed checks for SMS Industrial Lime Sales. Appellant would bring her blank checks to sign, telling her that he needed to pay some bills. One of the checks—which appellant filled out after she signed it—was

---

[3]Elizabeth Rodgers, appellant's niece, worked for appellant during part of the time in question. According to her, Stowe was a customer who would place orders by telephone for LHWD. Appellant's computer was old and broke down a lot, as did the printer. If the computer was not working, Rodgers handwrote invoices. Most of the invoices she prepared were handwritten. Some of the items ordered were very large. She had many orders "drop-shipped" directly to the work site, depending on the item(s) involved.

[4]Distributors had access to Waterman's catalogues and parts lists.

for $25,000 and was made payable to Jim Van Pelt. She did not know why the check was written. Another check, which appellant again filled out after she signed it, was made out to Dennis Stowe in the amount of $5,000. Stowe was not an employee of SMS Industrial Lime Sales, nor, to her knowledge, did the company ever do any business with him.[5] Appellant asked her to sign the check. A number of other checks were made out to Stowe by appellant or his wife and were signed by appellant and his wife. In addition, there were occasions on which Laurie Hooker made a deposit and then had a cashier's check made out to Dennis Stowe. Appellant directed her to do this. On one occasion, Laurie Hooker personally wrote a check to Stowe for $17,000 on SMS Industrial Lime Sales's business account. Appellant asked her to. She did not question him about it. In each instance when appellant brought blank checks to be signed, he would tell Laurie Hooker that he needed to pay some bills.

James Van Pelt ran a check cashing operation in which he charged $1 per $100 to cash a check. He had known Stowe for several years and had met appellant a couple of times. On one occasion, appellant wrote a check to Van Pelt for $10,000. Stowe brought Van Pelt the check, and Van Pelt cashed it because Stowe asked him to. On another occasion, Van Pelt cashed a $25,000 check, made out to himself, for Stowe. On both occasions, Van Pelt charged his normal fee to cash the checks. The remainder of the money went to Stowe.

Detective McBride analyzed the invoices submitted to LHWD by appellant. SMS Industrial Supplies and D. E. Moore submitted a total of approximately $344,000 in invoices over a three-year period. McBride also analyzed the checks issued by LHWD to SMS Industrial Supplies and D. E. Moore from 1991 to 1993. Payments totaled $344,293.23. Of this amount, $114,441.62 was deposited directly into the account of SMS Industrial Lime Sales. Of the amount paid to SMS Industrial Supplies and D. E. Moore, only $4,442.36 was on computer-generated invoices. The rest was on handwritten invoices. Of the bank accounts McBride reconstructed during his investigation, checks totaling $155,190 were made payable to Dennis Stowe or James Van Pelt.

---

[5]According to Kathy Stowe, Stowe's wife, Stowe was never employed by appellant, although he said he had done work for him. To her knowledge, Stowe's sole source of income from 1991 through 1993 was his salary with LHWD. On at least one occasion, Kathy Stowe deposited a check from appellant to her husband. To her knowledge, they never borrowed any money from appellant.

DISCUSSION

I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II.

*Propriety of Judicial Notice*

As noted, appellant was charged in count 1 with conspiracy to misappropriate public funds, the latter offense being a violation of section 424, subdivision 1. That statute punishes "[e]ach officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who . . . [¶] [w]ithout authority of law, appropriates the same, or any portion thereof, to his own use, or to the use of another . . . ."

The prosecution's theory was that coconspirator Dennis Stowe was an officer of a "district of this state" by virtue of his position as superintendent of LHWD. Accordingly, the People filed a written motion asking the trial court to take judicial notice that LHWD is a legally constituted "district" of the State of California, as that term is used in section 424. In support of the request, the People attached a copy of a "JUDGMENT VALIDATING $12,700,000 Principal AMOUNT OF BONDS OF LOST HILLS WATER DISTRICT FOR IMPROVEMENT DISTRICT NO. 9 THEREOF," entered in Kern County Superior Court case No. 190545. The plaintiff in that matter was shown as "LOST HILLS WATER DISTRICT, a California water district." In part, that judgment (which was filed on June 14, 1985) stated: ". . . the court finds as follows: [¶] 1. Lost Hills Water District is now and at all time [*sic*] since February 8, 1963, has been a California Water District duly organized and existing under and by virtue of the provisions of Division 13 of the Water Code of the State of California." The People also asked the court to take judicial notice based upon judgments validating contracts on behalf of LHWD, which were filed and entered in three Kern County Superior Court cases. The People provided the names and numbers of those cases. The People argued that the judgment in No. 190545 conclusively established that LHWD is a district of the state, in addition to which the court had access to the complete files of the other cases. Accordingly, the People concluded, LHWD's status was not subject to dispute and was readily ascertainable.

The trial court held an in camera hearing on the motion. During argument, defense counsel stated that his research had uncovered laws in the Water

---

*See footnote *ante*, page 168.

Code which specifically applied to LHWD. He asserted that under the Water Code, certain procedures had to be followed; if they were not, the district would not qualify as a California water district under the Water Code. Counsel represented that one requirement was that a certificate issued by the Secretary of State had to be filed with the County of Kern. His investigator went to the county clerk's office and, after what counsel conceded was not a search of the complete records, was unable to find such a certificate. Defense counsel took the position that unless the prosecution produced the certificate, LHWD's status as a valid state entity was not established.[9] The prosecutor responded that he "suspect[ed]" that the certificate was filed as an exhibit in the cases listed in his moving papers, although he could not represent this as a fact. He asked the court to take judicial notice of those entire files, as well as the judgments. The court stated it was familiar with the judgments and ruled that it would take judicial notice of them. It then directed the prosecutor to prepare an appropriate instruction for the jury.

The prosecutor subsequently requested, in the presence of the jury, that the court take judicial notice of the fact that LHWD was a "district." The court did so, then explained to the jury: "We take judicial notice of certain facts that can be easily demonstrated to the Court that might require quite a bit of testimony to prove up to a jury. When I tell you I'm taking judicial notice, I'm telling you that's a fact, you don't have to worry about that."

Appellant now says the trial court erred by taking judicial notice. Although his argument could be clearer, he appears to be claiming judicial notice was improper because, absent the formation certificate, the information could not be verified.

Evidence Code section 452 provides in pertinent part:

"Judicial notice may be taken of the following matters . . . :

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(d) Records of (1) any court of this state . . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(g) Facts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute.

---

[9]Defense counsel's representation about the certificate procedure was incorrect. In fact, the county clerk is required to file with the Secretary of State, upon formation of a district, a certificate listing the name of the district, date of formation, the county or counties in which the district is located, and the boundaries of the district. (Wat. Code, § 34503.) The defense investigator was searching in the wrong place.

"(h) Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy."

Pursuant to Evidence Code section 453, the trial court is required to take judicial notice of any matter specified in Evidence Code section 452 if requested to do so by a party, if that party "(a) Gives each adverse party sufficient notice of the request, through the pleadings or otherwise, to enable such adverse party to prepare to meet the request; and [¶] (b) Furnishes the court with sufficient information to enable it to take judicial notice of the matter."

Although appellant says that LHWD's status was not a proper subject for judicial notice, his real argument seems to be that the prosecution did not furnish the trial court with sufficient information, as required by Evidence Code section 453, subdivision (b), to enable it to determine that the district's status was either of such common knowledge within Kern County that it could not reasonably be the subject of dispute (permitting judicial notice under Evid. Code, § 452, subd. (g)), or that its status was not reasonably subject to dispute and was capable of immediate and accurate determination (permitting judicial notice under Evid. Code, § 452, subd. (h)).

██ "The burden is on the party requesting judicial notice to supply the court with sufficient, reliable and trustworthy sources of information about the matter. Resort to accurate sources of information is necessary to enable a court to take judicial notice of many matters. A court is not required to seek out on its own initiative indisputable sources of information. Whether information supplied by a party is sufficient for the purpose will vary from case to case. In some cases the original source documents may be required to provide the court with sufficient information. If the information supplied is not sufficient the trial judge is entitled to refuse to take judicial notice of the matter requested. [Citation.]" (*People* v. *Maxwell* (1978) 78 Cal.App.3d 124, 130-131 [144 Cal.Rptr. 95], italics omitted.)

It is difficult to understand why, if the prosecutor suspected the formation certificate was contained in the court files of the cases he listed in his motion, he did not seek it out for the trial court. Nevertheless, the trial court stated that it was familiar with the judgments called to its attention by the prosecutor, and it took judicial notice of them.[10] We cannot tell, however, whether any of those judgments actually adjudged LHWD to be a district of the State of California, or whether—like the judgment in No. 190545—they simply recited that it was, as one of the court's findings.

---

[10]In addition, by the time the trial court made its ruling, Phillip Nixon had already testified that LHWD is "a California water district[.]"

If the latter, the existence of the judgments was an insufficient basis for judicial notice of LHWD's status. ▉ "Judicial notice may be taken of the records of a court of this state [citations]. This is not to say, however, that judicial notice may be taken of the truth of facts asserted in every document in a court record." (*People* v. *Tolbert* (1986) 176 Cal.App.3d 685, 690 [222 Cal.Rptr. 313].) Judicial notice of findings of fact does not mean those findings are true, but simply that they were made. (*Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1564-1565 [8 Cal.Rptr.2d 552]; see *Professional Engineers* v. *Department of Transportation* (1997) 15 Cal.4th 543, 590 [63 Cal.Rptr.2d 467, 936 P.2d 473] (dis. opn. of Ardaiz, J.).) Thus, while a court can take judicial notice that a court made a particular ruling, it cannot take judicial notice of the truth of a factual finding made in another action. (*Fowler* v. *Howell* (1996) 42 Cal.App.4th 1746, 1749-1750 [50 Cal.Rptr.2d 484].)

Given the foregoing, if the trial court here relied on the *truth* of findings in the listed judgments to the effect that LHWD was a duly constituted district of the state, it erred. If it relied on the *existence* of those judgments, together with Nixon's testimony, was this information sufficient? We need not answer this question because judicial notice was proper for another reason. (See *People* v. *Zapien* (1993) 4 Cal.4th 929, 976 [17 Cal.Rptr.2d 122, 846 P.2d 704]; *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

▉ Courts are required to take judicial notice of the laws of this state. (Evid. Code, § 451, subd. (a); *People* v. *Jefferson* (1956) 47 Cal.2d 438, 445 [303 P.2d 1024]; *In re Culver* (1921) 187 Cal. 437, 440 [202 P. 661].) Division 13 of the Water Code (Wat. Code, § 34000 et seq.) "shall be known and may be cited as the California Water District Law." (Wat. Code, § 34000.) Chapter 2 of the division, which consists of definitions, governs the construction of the division. (Wat. Code, § 34010.) Thus, for purposes of division 13, " 'District' except as otherwise provided means a water district formed pursuant to the California Water District Act or to this division." (Wat. Code, § 34013.) The provisions of chapter 2.2 (Wat. Code, § 35520-35520.46) of part 5 of division 13 "apply only to the Lost Hills Water District." (Wat. Code, § 35520.) The provisions of chapter 2.75 (Wat. Code, § 35540-35554) of part 5 of division 13 "apply only to the Lost Hills Water District as a member unit of the Kern County Water Agency." (Wat. Code, § 35540.) Both chapters refer to "district" (see, e.g., Wat. Code, §§ 35520.1, 35541) which, pursuant to Water Code section 34013, means a water district formed pursuant to the California Water District Act—i.e., a water district of

the State of California.[11] This conclusively establishes LHWD's status as a district of the State of California. The trial court was therefore entitled to take judicial notice that LHWD is a "district."[12]

## III.

### Jury Instruction Concerning Judicially Noticed Fact

As previously noted, the trial court briefly explained the effect of judicial notice to the jury when it formally noticed LHWD's status. Appellant does not now challenge those comments. Later, during jury instructions, the court told the jury:

"Defendant is charged in count one of the Information with the crime of conspiring to misappropriate public monies with a public officer, in violation of Penal Code 424.1.

"Each officer of this state or of any county, city, town or district of this state and every other person charged with the receipt, safekeeping, transfer or disbursement of public monies, who without authority of law, appropriates the same or any portion thereof to his own use or to the use of another is guilty of the crime of misappropriation of public monies by a public officer, in violation of Penal Code Section 424.1.

"*You are instructed that for purposes of determining whether or not the defendant is guilty of misappropriation of public monies, the Lost Hills Water District is a district for purposes of that Penal Code Section 424.1.*" (Italics added.) Appellant now contends the emphasized portion of the instruction removed an essential element of the offense from the jury's consideration, mandating reversal of the conviction on count 1.[13]

"The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." (*United States* v. *Gaudin* (1995) 515 U.S. 506, 522-523, [115 S.Ct. 2310, 2320, 132 L.Ed.2d 444].) To determine whether the challenged instruction ran afoul of this principle, we begin by

---

[11]We take judicial notice of the provisions of division 13 of the Water Code, having previously notified the parties of our intent to do so and having afforded them the opportunity to present information relevant thereto. (Evid. Code, §§ 455, 459.)

[12]We note that, given Nixon's testimony, the evidence was sufficient to establish LHWD's status for purposes of section 424 even assuming judicial notice could not properly be taken.

[13]This claim of instructional error is reviewable on appeal despite the lack of objection to the instruction in the trial court. (§ 1259; *People* v. *Beltran* (1989) 210 Cal.App.3d 1295, 1302 [258 Cal.Rptr. 884].)

reviewing various opinions of the United States Supreme Court and the courts of this state concerning this issue.

*People* v. *Figueroa* (1986) 41 Cal.3d 714 [224 Cal.Rptr. 719, 715 P.2d 680] was a prosecution for the sale of unqualified securities. The Corporations Code contained a lengthy definition of "security," and the defense offered evidence on the question whether the instruments at issue constituted securities. Over objection, the trial court instructed the jury that the instruments constituted "securities" within the meaning of the Corporate Securities Law. The court did not read the statutory definition to the jury, and the prosecutor relied on the instruction in her summation. (*Id.* at pp. 717-718, 723-724 & fn. 9.)

At issue on appeal was whether the giving of the challenged instruction was tantamount to a directed verdict on the "security" element of the charged offense. (*People* v. *Figueroa, supra,* 41 Cal.3d at p. 724.) In determining that error of constitutional dimension occurred, the California Supreme Court noted that a trial court " 'may not direct a verdict of guilt no matter how conclusive the evidence.' [Citations.]" (*Ibid.*) In a criminal trial, " '[n]o fact, not even an undisputed fact, may be determined by the judge.' [Citations.]" (*Ibid.*) "If a judge were permitted to instruct the jury on the basis of assertedly 'undisputed' evidence that a particular element had been established as a matter of law, the right to a jury trial would become a hollow guarantee." (*Id.* at p. 730.)

As to the notion the instruction was proper because the issue resolved was purely a question of law to be decided by the judge, the court found the law/fact distinction to be " 'elusive.' " (*People* v. *Figueroa, supra,* 41 Cal.3d at p. 730.) It explained that while juries are not judges of the law in determining what principles of law are applicable to the evidence, they " ' "are always judges of the law in the sense that juries must pass on the manner and the extent in which the law expounded by the judge fits the facts brought out in the evidence." . . .' " (*Ibid.*) The court observed: "In many criminal cases, the prosecution's evidence will establish an element of the charged offense 'as a matter of law.' Similarly, in many instances, the accused will not seriously dispute a particular element of the offense. [Citation.] However, neither of these sometime realities of trial practice justifies the giving of an instruction which takes an element from the jury and decides it adversely to the accused. *Such an instruction confuses the roles of judge and jury.*" (*Id.* at p. 733, fn. omitted, italics added.)

The court concluded that while the definition of "security" was a matter of law for the court, whether a particular piece of paper met that definition was

for the jury to decide. (*People* v. *Figueroa, supra,* 41 Cal.3d at pp. 733-734.)[14] That question was to be determined on a case-by-case basis. (*Id.* at p. 736.) By giving the challenged instruction, the trial judge "usurped the jury's province and applied the law to the facts as he understood them." (*Id.* at p. 741.) Noting that whether the instruments were "securities" was not a foregone conclusion, the court reversed the conviction without discussing whether this type of error could ever be subject to harmless-error analysis.

The following year, this court undertook an analysis of *Figueroa.* In *People* v. *Lawson* (1987) 189 Cal.App.3d 741 [234 Cal.Rptr. 557], we concluded that instructing the jury that an element of the offense is established as a matter of law constitutes an impermissible partial directed verdict. (*Id.* at p. 744.) Thus, no matter how conclusive the evidence, a trial court cannot directly inform the jury that an element of the crime charged has been established. Absent a stipulation by the defendant that an element is established or is admitted, the trial court must submit that question to the jury. (*Id.* at p. 747.) The trial court determines what law applies to the charges; to the extent possible, that law should be stated in abstract legal terms. (*Ibid.*) "Even such a simple concept as 'a gun is a firearm,' must be conveyed to the jury in definitional terms so as to permit the jury to apply the instruction in its factfinding/law-applying function." (*Id.* at p. 748.)

In assessing whether the error could be subject to harmless-error analysis, we noted that because of the assumption that jurors followed the court's instructions, it must be accepted that they failed to deliberate on any element taken from them by the trial court's misdirection. (*People* v. *Lawson, supra,* 189 Cal.App.3d at p. 748.) We declined to apply the harmless-beyond-a-reasonable-doubt standard of *Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; "The instructional error here amounted to prohibited factfinding by the court and thus requires reversal." (*Lawson, supra,* at p. 754.) Unlike *Sandstrom* error, in which the issue of a particular element was not wholly removed from the jury's consideration, the instruction in *Lawson* totally deprived the defendant of his right to a jury trial on an element of the offense. (*Ibid.*)[15]

In *People* v. *Hedgecock* (1990) 51 Cal.3d 395 [272 Cal.Rptr. 803, 795 P.2d 1260], which involved a perjury conviction arising from errors or

[14]The court did note that whether a generic type of document may come within the reach of the statute's prohibition was a question of law. (*People* v. *Figueroa, supra,* 41 Cal.3d at p. 734.)

[15]*Sandstrom* v. *Montana* (1979) 442 U.S. 510 [99 S.Ct. 2450, 61 L.Ed.2d 39] held that an instruction which contains a conclusive or burden-shifting presumption—in that case, " '[t]he law presumes that a person intends the ordinary consequences of his voluntary acts' " (*id.* at p. 513 [99 S.Ct. at p. 2453])— is unconstitutional. (*Id.* at pp. 521-524 [99 S.Ct. at pp. 2457-2459].) Such error subsequently was held to be subject to harmless-error analysis under *Chapman.* (*Carella* v. *California* (1989) 491 U.S. 263, 266 [109 S.Ct. 2419, 2421, 105

omissions in disclosure statements required by the Political Reform Act, the trial court instructed the jury that if it found the defendant made one or more statements as charged, those statements were material within the definition of perjury given. (*Id.* at p. 404.) On appeal, the People contended that materiality was a legal question for the trial court. The defendant argued that it constituted an element of the offense and therefore had to be determined by the jury. (*Id.* at p. 307.)

In holding that the issue of materiality should have been submitted to the jury, the California Supreme Court noted that *Figueroa* did not abrogate the question of law/question of fact distinction in determining whether issues should be submitted to the jury, but instead suggested the distinction plays a limited role in view of a defendant's constitutional right to have the jury determine the existence of every element of the offense charged. The critical question was thus whether materiality was an element of the offense, which it was. (*People* v. *Hedgecock, supra,* 51 Cal.3d at p. 407.) Moreover, the determination of materiality involved an evaluation of the significance of the defendant's statements or omissions, in the circumstances in which they were made. Such a task is appropriately entrusted to the jury. (*Id.* at p. 408.) With regard to a prejudice analysis, the court observed: "Generally, when a trial court instructs the jury that an element of the offense charged is conclusively presumed, the effect of the error appears to be measured by the 'harmless beyond a reasonable doubt' standard set forth in *Chapman* v. *California* (1967) 386 U.S. 18, 21. . . . [Citations.] But when the error renders the trial 'fundamentally unfair,' the error is reversible per se. [Citations.]" (*Hedgecock, supra,* at p. 410.) The court declined to determine which standard was appropriate, as the same result was reached under either: The factual questions were complex, the defendant did not concede the issue, and the instruction completely deprived the jury of the opportunity to consider the issue of materiality. (*Ibid.*)

In *People* v. *Ochoa* (1991) 231 Cal.App.3d 1413 [282 Cal.Rptr. 805], the appellate court rejected the usual harmless error analysis in situations in which an element of the offense was removed from the jury's consideration. It reasoned:

"When instructional error 'is equivalent to a directed verdict for the State' or otherwise results in removing from the jury a decision as to the existence

L.Ed.2d 218]; *Rose* v. *Clark* (1986) 478 U.S. 570, 576-582 [106 S.Ct. 3101, 3105-3108, 92 L.Ed.2d 460].) *It is not equivalent to a directed verdict for the state; when a jury is instructed to make a presumption from predicate facts, it still must find the existence of those facts beyond a reasonable doubt. If the predicate facts conclusively establish the fact presumed, the erroneous instruction is superfluous and the jury has found every fact necessary to establish every element of the offense beyond a reasonable doubt.* (*Carella, supra,* at p. 266 [109 S.Ct. at p. 2421].)

of a necessary fact, the usual method of assessing whether the error was harmless, i.e., a weighing of the evidence by the reviewing court, does not apply. (*Rose* v. *Clark* (1986) 478 U.S. 570, 578, 580 . . . .) This is because 'the error in such a case is that the wrong entity judged the defendant guilty.' (478 U.S. at p. 578 . . . .)

"In such a case, instead of using the usual method of assessing harmless error, the reviewing court must look to see whether, despite the instructional error, 'the jury necessarily resolved, although in a different setting, the same factual question that would have been presented' but for the instructional error. (*People* v. *Mayberry* (1975) 15 Cal.3d 143, 158 . . . .) If it finds that the jury resolved the factual issue in another context, then it can conclude that there was no prejudice to the defendant. (*Carella* v. *California* (1989) 491 U.S. 263, 270 . . . (conc. opn. of Scalia, J.); *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 . . . , overruled on another ground, *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 . . . .)" (*People* v. *Ochoa, supra*, 231 Cal.App.3d at p. 1424.)[16]

In 1993, the United States Supreme Court returned to the issue of harmless error analysis. In *Sullivan* v. *Louisiana* (1993) 508 U.S. 275 [113 S.Ct. 2078, 124 L.Ed.2d 182], the question was whether a constitutionally deficient reasonable doubt instruction could constitute harmless error. In discussing this issue, the court noted that the Sixth Amendment right to trial by jury "includes . . . , as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' " (*Sullivan, supra*, at p. 277 [113 S.Ct. at p. 2081].) "[A]lthough a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence." (*Ibid.*)

Turning to the prejudice analysis, the court explained that under *Chapman*, error is harmless if the state can show beyond a reasonable doubt that it did not contribute to the verdict. (*Sullivan* v. *Louisiana, supra*, 508 U.S. at p. 279 [113 S.Ct. at pp. 2081-2082].) What *Chapman* thus "instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." (*Ibid.*) "The inquiry, in other

---

[16]The People here argue that, assuming error did occur, it was harmless under the *Sedeno* exception because the jury necessarily resolved the question of LHWD's status adversely to appellant when it found, as implied by its guilty verdict on count 1, that Stowe was an officer of a district of the state. As appellant notes, however, the *Sedeno* exception does not apply because once the jury was told LHWD was a "district," it only had to find that Stowe worked for LHWD in order to conclude that he was an officer of a district of the state. Thus, the jury did not necessarily resolve the issue in another context.

words, is not whether, in a trial that occurred without error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." (*Ibid.*) Given the nature of the error in *Sullivan*, there was no jury verdict within the meaning of the Sixth Amendment; hence, the premise of *Chapman* review was absent. (*Id.* at p. 280 [113 S.Ct. at p. 2082].) It was not enough to conclude the jury surely would have found guilt beyond a reasonable doubt; a reviewing court could not conclude the actual finding surely would not have been different absent the error. (*Ibid.*) Thus, this type of error is different from that involving a mandatory presumption. Such a presumption violates the Fourteenth Amendment because it may relieve the state from proving all elements of the offense. However, the jury must still find the predicate facts beyond a reasonable doubt. Such error is therefore subject to harmless error analysis where the jury could not find the predicate facts without also finding the ultimate fact, thus making the findings the functional equivalent to finding the element required to be presumed. (*Id.* at pp. 280-281 [113 S.Ct. at pp. 2082-2083].)

In *United States* v. *Gaudin, supra,* 515 U.S. 509 [115 S.Ct. 2310], the defendant was convicted of making material false statements in a matter within the jurisdiction of a federal agency. The trial court refused to submit the question of materiality to the jury, and instead instructed the jury that the statements were material. (*Id.* at pp. 507-508 [115 S.Ct. at p. 2312].) The United States Supreme Court held that materiality is an element of the offense, and the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." (*Id.* at p. 510 [115 S.Ct. at p. 2313], fn. omitted.) The concurrence suggested the question is not yet settled whether such error can ever be harmless. (*Id.* at pp. 525-527 [115 S.Ct. at pp. 2321-2322] (conc. opn. of Rehnquist, C. J.).)

Most recently, in *People* v. *Kobrin* (1995) 11 Cal.4th 416 [45 Cal.Rptr.2d 895, 903 P.2d 1027], the California Supreme Court returned to the issue of materiality as an element of perjury, this time (unlike in *Hedgecock*) under the standard perjury statute (§ 118). It noted that withholding an element of the offense from the jury runs afoul of the due process clause of the United States Constitution, as a state may not deprive an accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. Such an instruction also implicates the defendant's Sixth Amendment right to a jury trial. (*Kobrin, supra,* at p. 423.) After examining the language of section 118 and its historical antecedents, the court concluded that materiality is, indeed, an element of perjury, the "critical inquiry" in the case. (*Kobrin, supra,* at pp. 426-427.) It necessarily followed

that (a) the Constitution requires that the jury decide each element of the offense beyond a reasonable doubt; (b) materiality is an element of the crime charged; therefore, (c) the Constitution requires that the jury decide materiality. (*Id.* at p. 427.)

The court then turned to the question of prejudice, noting that instructional error of federal constitutional proportions is generally subject to harmless error analysis under *Chapman.* "When the deficiency is of [such] a magnitude that it infects the structural integrity of the trial process, however, it is reversible per se. [Citation.] Both this court and the United States Supreme Court have strongly implied that omitting to instruct on an element of an offense comes within the latter category. [Citations.]" (*People* v. *Kobrin, supra,* 11 Cal.4th at p. 428.)[17] The court likened the situation to that in *Sullivan.* (*Id.* at p. 429.) Moreover, even if the error could be harmless, in refusing to submit the issue to the jury, the trial court rejected evidence on the issue; the defendant did not concede the issue; and the instruction completely deprived the jury of the opportunity to consider the matter. Thus, the reviewing court could not say beyond a reasonable doubt the instruction had no effect on the verdict. (*Id.* at pp. 429-430.)

None of the foregoing cases, nor any we have been able to find, deal with the precise situation here: an instruction following, and premised on, the trial court's having properly taken judicial notice of a fact. ■ "It is the consequence of judicial notice that the 'fact' noticed is, in effect, treated as true for purposes of proof." (*Sosinsky* v. *Grant, supra,* 6 Cal.App.4th at p. 1564.) Thus, "[j]udicial notice has been characterized as a 'substitute for formal proof.' [Citation.]" (*People* v. *Rubio* (1977) 71 Cal.App.3d 757, 765 [139 Cal.Rptr. 750], disapproved on other grounds in *People* v. *Freeman* (1978) 22 Cal.3d 434, 438-439 [149 Cal.Rptr. 396, 584 P.2d 533].) Where notice is mandatory, the indisputable fact must be accepted and no evidence can be offered to dispute it. (1 Witkin, Cal. Evidence (3d ed. 1986) Judicial Notice, § 82, p. 76.)

■  Here, judicial notice was mandatory. Under the provisions of the Water Code, there was no factual question concerning LHWD's status.[18] The trial court determines the law to be applied to the facts of a case (*In re*

---

[17]The court noted that harmless error analysis would still be appropriate under the *Sedeno* exception. (*People* v. *Kobrin, supra,* 11 Cal.4th at p. 428, fn. 8.)

[18]As suggested by Justice Kennard in her concurring and dissenting opinion in *People* v. *Harris* (1994) 9 Cal.4th 407 [37 Cal.Rptr.2d 200, 886 P.2d 1193], "In criminal cases, the right to jury trial is, primarily, a right to have the jury rather than a court decide every 'issue of fact' arising in the trial of the criminal charge. But when a fact is undisputed, or the parties have stipulated to its existence, there is no 'issue of fact' for the jury to resolve, and this aspect of the Sixth Amendment right to jury trial is not implicated. Otherwise stated, the

*Stankewitz* (1985) 40 Cal.3d 391, 399 [220 Cal.Rptr. 382, 708 P.2d 1260]); under the law, LHWD was a "district."

In our view, the trial court's so instructing jurors did not remove an element of the offense from the jury's consideration. It is true that sections 424, subdivision 1 and 425 "were intended to punish those charged with the receipt and transfer of moneys belonging to the state or a subdivision thereof and who misappropriate such moneys when there is a nexus between the moneys they are charged with and the moneys misappropriated." (*People* v. *Wall* (1980) 114 Cal.App.3d 15, 22 [170 Cal.Rptr. 522].) Thus, for appellant to be guilty of count 1, Stowe had to be an officer of a district of the state. This does not mean, however, that the trial court removed an element of the offense from the jury's consideration by instructing the jury on the matter of which it took judicial notice.

Rather than being analogous to the cases previously reviewed, this case is similar to, and our resolution of the issue guided by, *People* v. *Brown* (1988) 46 Cal.3d 432 [250 Cal.Rptr. 604, 758 P.2d 1135]. In that case, which involved a peace-officer-killing special circumstance, the trial court instructed the jury on the elements of the special circumstance and that, for purposes of the instructions, a Garden Grove Police Officer was a "peace officer." In rejecting the defendant's argument that the trial court improperly removed an element of the special circumstance from the jury's consideration, the California Supreme Court reasoned: "As instructed, the jury was left to determine all elements of the special circumstance: It had to determine (i) if the victim was a peace officer, (ii) if he was intentionally killed in the performance of his duties, and (iii) if defendant knew or reasonably should have known the victim was a peace officer engaged in the performance of his duties. The challenged final sentence took no element from the jury; it merely instructed the jury on a point of statutory law—a point not open to dispute—that a Garden Grove police officer is a peace officer. (§ 7, subd. 8 ['The words "peace officer" [throughout the Penal Code] signify any one of the officers mentioned in . . . Section 830 (et seq.)']; § 830.1, subd. (a) ['Any . . . police officer of a city . . . is a peace officer'].) The jury was left to make all essential factual determinations, including whether the victim was a Garden Grove police officer." (*Brown, supra,* at pp. 443-444, fn. omitted.) In a footnote, the court stated: "*People* v. *Figueroa* (1986) 41 Cal.3d 714 . . . , is distinguishable. We held in *Figueroa* the court erred in instructing that particular promissory notes at issue in that case were securities as a matter of law. As noted, the court here did *not* instruct the jury that

federal Constitution gives an accused no right to have the jury decide the truth of a fact that the accused has elected not to contest." (*People* v. *Harris, supra,* 9 Cal.4th at p. 459, fn. omitted (conc. & dis. opn. of Kennard, J.).)

*Officer Reed* was a peace officer as a matter of law; it merely instructed pursuant to the unquestionable and clear terms of the relevant statutes that Garden Grove police officers are peace officers." (*People* v. *Brown, supra,* 46 Cal.3d at p. 444, fn. 6.)

Here, the trial court did not instruct that Stowe was an officer of a district of the state. Instead, as in *Brown,* it merely instructed that LHWD was a district. (See also *People* v. *Dimitrov* (1995) 33 Cal.App.4th 18, 26 [39 Cal.Rptr.2d 257] [not error to instruct, with regard to charge of unlawful possession of destructive device, that pipe bomb constitutes destructive device; instruction merely conveyed applicable statutory definition of destructive device and did not tell jury device in question was pipe bomb]; contrast *People* v. *Daniels* (1993) 18 Cal.App.4th 1046, 1052 [22 Cal.Rptr.2d 877] [prejudicial error to remove element of kidnapping offense from jury's determination by instructing that movement of 500 feet was "substantial" as a matter of law].)

*U.S.* v. *Johnson* (4th Cir. 1995) 71 F.3d 139, upon which appellant relies, does not compel a different conclusion. In that case, the defendant was prosecuted for armed robbery of a credit union. Although he did not stipulate or concede the business was a credit union, he introduced no contrary evidence. Over his objection, the trial court instructed the jury that the business was a credit union within the terms of the statute. (*Id.* at pp. 141-142.) The appellate court held that the giving of the instruction, which removed an essential element of the offense from the jury's consideration, constituted federal constitutional error. (*Id.* at pp. 142-143.) Unlike the present case, however, *Johnson* involved no statutory provisions which conclusively resolved the issue of status. Instead, the statute in question set out a definition of what constituted a "credit union." (*Id.* at p. 142, fn. 1.) Factually, then, *Johnson* is similar to *Figueroa.* By contrast, the provisions of the Water Code render *Brown* controlling of the present case.

The judgment is affirmed.

Wiseman, J., and Levy, J., concurred.