Filed 11/6/15  P. v. Lockett CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA LOCKETT et al.,<br><br>Defendants and Appellants. | B256242<br><br>(Los Angeles County<br>Super. Ct. No. MA058054) |

APPEAL from judgments of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Affirmed as modified.

Corona & Peabody and Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Joshua Lockett.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant Randy Sullivan.

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Terrell Henderson.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendants Joshua Lockett, Randy Sullivan, and Terrell Henderson of second degree murder. In 2012, defendants—two brothers and their cousin—got into a brawl with another family. During the confrontation, a man defendants brought to the fight shot and killed the victim, Brandon Houston. On appeal, defendants contend the evidence was insufficient for a jury to conclude they were liable under either a direct aiding and abetting theory, or a natural and probable consequences theory. In a related argument, defendants contend the trial court erred in instructing the jury on natural and probable consequences because the theory was unsupported by any evidence. We affirm the judgments as to Lockett and Sullivan, and affirm as modified as to Henderson.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize the evidence in accordance with the usual rules on appeal.[1] (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.) On November 29, 2012, Brandon Houston and Ke'ana Moore, Houston's girlfriend and the mother of his infant son, had a heated argument and shoving match. The electricity had been turned off in the Lancaster apartment where they lived and Houston was jealous because he discovered Moore had been texting an ex-boyfriend. Although Moore wanted to leave, Houston did not want her to take the baby away from the house. At trial, one of Houston's sisters testified Houston told Moore he did not want another man coming over to pick up Moore and his son. The sister remembered Moore telling Houston "he was going to get his." Houston walked outside to calm down. Moore called her sister and asked for a ride.

---

[1] Defendants were charged with murder. The information alleged a gang enhancement pursuant to Penal Code section 186.22, subdivision (b)(4). It further alleged a principal personally and intentionally discharged a firearm, causing great bodily injury, within the meaning of Penal Code section 12022.53, subdivisions (d) and (e)(1), and a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e). The information further alleged Henderson had suffered a prior strike and serious felony conviction (Pen. Code, § 667, subds. (a)(1), (d), § 1170.12, subd. (b)). It was alleged that Sullivan served two prior prison terms (Pen. Code, § 667.5, subd. (b)).

Henderson, Lockett, and Sullivan arrived in a black SUV that Henderson was driving. Henderson and Sullivan are brothers; Lockett is their cousin. Henderson was dating Moore's sister. Houston and his 14-year-old nephew, D.S., were sitting on the steps outside the apartment. The defendants and Houston were all acquainted. Houston had once fought Lockett when they were both in high school.

Upon arriving at the apartment building, Henderson honked the horn. Moore came outside with her baby (Houston's son). Henderson got out of the car and moved the seat so that Moore could get in. Sullivan and Lockett were still in the car. As Moore went to the SUV, Houston told her to wait. When Moore protested, Houston said he wanted to kiss his son.

As Houston was walking away from the SUV, Henderson bumped or pushed him and told him to move. Houston backed up and prepared to hit Henderson. D.S. told Henderson: "Don't put your hands on my uncle." Henderson and D.S. "squared up," or prepared to fight. By this time, D.S.'s mother and Houston's sister, Chrishonda Coulter, had joined the group. Either Houston or Coulter told Henderson, "You aren't going to fight him," referring to D.S., "he's 14." Coulter told Henderson that D.S. was not grown, indicating that if Henderson had a problem with D.S., he had a problem with her.

Sullivan got out of the SUV, took off his shirt, and said, "I'm Southside Crip. Where you from?" Sullivan was a self-admitted gang member. Houston responded, "I'm not with that." Coulter said she knew some people from "190," a Crips gang in Carson.[2] Sullivan said, "We don't get along with those, they just killed one [of] us." Houston told Sullivan, "It's not about that. It's about you guys coming to my mom's house being disrespectful." Sullivan shook hands with Houston and said he "had love" for Houston, Moore, and their son. However, Henderson and D.S. were still arguing and Coulter attempted to intervene.

---

[2]     Coulter testified at trial that while this discussion of gangs occurred: "It wasn't about that. It was about respecting my mom's home."

Houston's mother threatened to call the police. Henderson and Sullivan got back into the SUV. As defendants and Moore drove away, Henderson yelled that they would be back. In the car, Sullivan said he needed to call one of his "homies" to tell them he just got into it with someone from 190. He did not call anyone at that time. The defendants dropped Moore off and drove away.[3]

Meanwhile, Houston and D.S. walked to a liquor store. Houston and D.S. encountered some of Houston's friends who had heard Houston was "getting jumped." As Houston and D.S. were talking to the friends, they saw the SUV drive past. Coulter and her sister had joined Houston and D.S. Between 10 and 20 minutes had passed since Henderson said he would be back. D.S. saw Sullivan, Lockett, Henderson, and two other people in the SUV. Lockett was driving. Henderson pointed at Houston's group.[4] The SUV drove in a back alley through a nearby shopping center. D.S. saw the SUV circle the area once, then he lost sight of it. Houston, along with his friends and family, continued walking, only to meet the group from the SUV walking straight over to them. The defendants were accompanied by a fourth man, Denelle Wilson, who some of Houston's group knew as "Baby Frost" or "Jack Frost." Wilson was in a relationship with Henderson's and Sullivan's sister. A fifth man wearing a black hoodie and a yellow or gold shirt lagged behind. No one with Houston recognized the fifth man.

The two groups met. One of Houston's friends, Aaron Chism, knew Henderson and Lockett; they had gone to school together and Chism described them as "homeys." Chism also had seen Sullivan around; they shook hands. Sullivan said, "How do you want to do this?" When D.S. asked what he meant, Sullivan said, "You said you want to

---

[3]    On cross-examination, Moore testified that while she was in the SUV there was no discussion of anyone getting a gun, and no discussion at all of the Compton Southside Crips.

[4]    On cross-examination, Coulter testified she waved the SUV down.

4

fight my brother," referring to Henderson.[5]  Henderson said he wanted to fight D.S., but Coulter said she would not allow it because D.S. was underage.  Henderson ran up and punched D.S. in the nose.  Everyone began fighting.  Sullivan was fighting one of Houston's friends.  Lockett was fighting Houston.

The fifth man wearing a hoodie was hiding behind a car.  He was not fighting anyone.  Suddenly, he left his position by the side of a car and approached the middle of the crowd.[6]  He fired two shots in the air.  Everyone scattered and began running away.  The shooter pointed the gun at one of Houston's friends, shot, and missed.  The shooter then looked at Houston.  Houston turned and tripped on the curb.  The shooter shot Houston in the leg, then approached, stood over him, and fired multiple shots at him.  D.S. testified the only person he saw with a gun or weapon was the shooter.

The defendants, Wilson, and the shooter ran back to the SUV.  They drove to the home of Shemita Cartwright, Henderson and Sullivan's sister, and Wilson's girlfriend.  Police arrived some time later and apprehended defendants, but not the shooter.  The black SUV was parked inside a closed garage.  Police recovered cell phones in the house; the call and message history had been deleted from each phone. Law enforcement was unable to locate the shooter.

---

[5]     According to Coulter, in response to Sullivan's question, "everybody was like 'we all came to fight.' "  On cross-examination, Coulter testified that Henderson said he wanted to fight D.S.; Coulter said D.S. was a kid and Henderson would have to fight her.  Henderson responded:  " 'Ma'am, my mother taught me better than that.  I am not going to hit you.' "  The fight broke out.  Coulter blacked out and fell to the ground.  When she woke up, she saw a guy standing over Houston, shooting him.  Coulter indicated she did not remember being punched, and did not know if she lost consciousness because of a blow or because of health reasons.

[6]     One of Houston's friends testified he did not see the shooter before the shots were fired, "because the shooter, he did like a magic trick.  He just appeared out of nowhere."

***Gang expert testimony***

The prosecution offered the testimony of two gang experts. The first expert explained that in gang culture, respect "is huge," and "a perceived act of disrespect can go anywhere from a verbal altercation to a shooting . . . at any second." He suggested that in a "territorial, South Central L.A. gang mentality," an incident or threat that disrespects the gang would have to be addressed. When presented with a hypothetical based on the facts of the case, the expert opined the brawl was a distraction that allowed the shooter to conduct a daytime execution that would benefit the gang.

The second gang expert testified about the Southside Compton Crips. He indicated they "associate with the color blue, sometimes black, blue and gold, because they'll often wear lettered attire, and . . . some of their attire is the Seattle Mariners' attire, where it would be blue and gold . . . you'll have a gold 'S' on a blue hat." He also opined that, based on a hypothetical similar to the facts of the case, he would conclude the shooting was gang-related. He further testified: "They left together, they came back together, they . . . left the scene together, and it's been in my experience over the years, gang members going to a rival area or against a rival, they're usually going to make sure—especially if they're going in another neighborhood—that they are protected and they have a weapon. And in all the cases that I can recall, the persons in the car are going back to commit the crime, with the early assault or the shooting, are aware that there is a weapon in the car."

Lockett also offered the testimony of a gang expert. In response to a hypothetical mirroring the facts of the case, the expert opined the cousin of the person invoking the Southside Crips gang name would not be associating for the benefit of the gang. He opined the facts represented a confrontation related to family matters, and both groups appeared to have the expectation of merely a fight, with the exception of the shooter. The expert did indicate if the shooter was from the Southside Compton Crips, his opinion would be that the shooting was likely for the benefit of the gang. However, he further explained that the mere shouting of gang names does not automatically mean a person is "gang banging."

**Defense Evidence**

Lockett testified on his own behalf.[7]  According to Lockett, at the time of the incident, Henderson and Lockett were living in the same house.  Henderson's girlfriend (also the mother of his child) asked him to pick up her sister, Moore.  As Henderson and Lockett were leaving the house, Sullivan called and asked for a ride because his bicycle tires were flat.  As the three defendants pulled up to Houston's house, Lockett could see that Houston was agitated.  Lockett knew Houston; they had previously had an altercation in high school.  However, they had not had any problems since, and Houston had been to Lockett's house multiple times.  Moore was crying as she walked to the SUV.  Houston approached to kiss the baby.  D.S. was behind Houston.  Sullivan tried to help Moore get the baby in the car.  Lockett was sitting in the passenger seat.  He did not know exactly what happened, but Henderson and D.S. ended up having an altercation.  Houston and Sullivan exchanged words.  Lockett got out of the car to let Sullivan out of the backseat.  The exchange between Henderson and D.S. grew more heated.  Coulter and Sullivan made gang references.  Lockett did not intervene, because, as he explained:  "I don't have anything to do with gangs, so I don't know.  I don't want to say anything about it."  He denied being a gang member or associating with gangs. He testified Sullivan was his cousin.  Sullivan sometimes went to his mother's house, where Lockett was living, so "of course" Lockett hung out with him.  But Lockett and Henderson were close and went everywhere together.

In Lockett's version of events, Sullivan told Houston they had not come to disrespect Houston's house.  Houston, observing Henderson and D.S., said there would be no fighting right there.  Instead, "If you wanna fight, you all drop my son off and come back in front of the apartments to fight."  Once Lockett got back into the car, Henderson pointed to D.S. and said, "I'll be back for you."  After they drove away, Sullivan said he was going to call someone.  Henderson responded:  "You don't have to

---

[7]     Prior to trial, Lockett was caught attempting to pass a note to Henderson while in jail.  The note detailed a version of the events leading up to and including the shooting.  At trial, Lockett's testimony was consistent with the note.

call nobody, this between me and [D.S.]." Sullivan did not call anyone. The defendants dropped Moore off. They left again, with Lockett driving. Henderson called Wilson. Lockett thought Henderson was going to get Wilson and they were all going to a fight. Lockett went along because of Henderson. Once in the car, Wilson asked if they could pick up Wilson's cousin.[8] Lockett responded that he did not put gas in the car and was "just the person with a valid license." Wilson directed them to a house where he met someone at the front door. He returned to the car with a man he introduced as his cousin Darren. Lockett did not see any weapons on Darren. There was no discussion of weapons. Everyone greeted Darren and introduced themselves. Lockett had never met Darren before.

Lockett drove to the designated location of the fight. He drove past Houston's group on the street because he did not realize it was them. However, there were people in the street flagging down the car. No one in the car made any statements relative to gangs, flashed gang symbols, made reference to having a gun, or mentioned weapons. There was talk of everyone fighting, if necessary. Lockett was going back for Henderson to fight D.S. If multiple guys tried to jump Henderson, Lockett was prepared to defend his cousin.

Lockett parked the car and everyone got out. Lockett did not talk to Darren. When they met Houston's group, Sullivan shook someone's hand. Sullivan asked, "How you guys wanna do this?" Henderson said he wanted to fight D.S. D.S. took off his shirt and began walking toward Henderson. Coulter also walked toward Henderson, saying if he was fighting D.S., he would have to fight her. Henderson said he would not fight Coulter, indicating his mother had raised him "better than that," and he would not hit a woman. After that, everyone was in the middle of the street, some running around, some "squaring off," or preparing to fight, and some fighting. Lockett began looking for

---

[8]     Lockett testified that Wilson said "his cousin . . . [was] going back to his brother Robert house, and he asked me can I go pick him up." On cross-examination, Lockett testified the defendants picked Wilson up at his brother Robert's house. Lockett also admitted on cross-examination that Wilson "was called backup."

8

Henderson. Lockett was hit, or he tripped and fell. As he was getting up, he saw someone wearing a black hoodie run past. Shots rang out. Lockett was scared for his life, so he ran. He began to vomit. He made his way back to the SUV and handed the car keys to Sullivan. He thought the man in the black hoodie might have been the man Wilson brought, and he "didn't want any part of that." They all went to Lockett's cousin's house. No one spoke in the car. Lockett was scared. He again vomited. He saw Wilson tell Darren, "Let's go." The two left. Some time later the police arrived.

Lockett also offered the testimony of his cousin, Shemita Cartwright. Cartwright testified defendants, Wilson, and a fifth man wearing a black hoodie came to her house. She only saw the fifth man briefly before he left with Wilson. She had never seen him before. On cross-examination she testified that when she opened the door for the group, no one was saying anything, throwing up, screaming, or sweating, nor did they look nervous. She testified that the fifth man was not one of Wilson's two cousins she had seen before. She also admitted on cross-examination that during an interview with police on the day of the incident, she did not tell them that a fifth man wearing a black hoodie came to her house with defendants.

### *Argument, Deliberations, and Verdicts*

In his closing argument, the prosecutor argued the defendants engaged in a premeditated, deliberate murder of Houston. The prosecutor asserted that when Sullivan said he had to call someone because of the issue with 190, the person called was the shooter; Lockett drove because they all knew there was a gun in the car and they wanted no problems if they were pulled over by police; and the shooter hid during the brawl because they all had a plan. The prosecutor argued the shooter would only know the defendants had a "beef" with Houston if the defendants had told him. He asserted the shooter was wearing gang colors, he hid and did not get involved in the street fight, and he waited until he could sneak into the crowd and kill Houston. The prosecutor further repeatedly argued the incident was a premeditated and planned gang crime, reasoning that if the shooter was just a guy "picked up out of the blue, why not just start shooting everybody, right? Just start blasting." The prosecutor contended the group had to come

back because "gang members don't fight fair," the group felt disrespected and, in accordance with gang culture, they had to "get a guy with a gun" and "make a statement."

The jury was instructed on first and second degree murder. The court also instructed on both direct aiding and abetting liability, and the natural and probable consequences doctrine, with assault and battery identified as the target offenses. While deliberating, the jury asked the following questions: "Does each defendant have to touch [Houston] for battery to apply?"; "Does aiding and abetting as to assault and battery apply to our understanding of [Instruction No.] 960 [battery]?"; "Can you provide clarification as to natural and probable consequences in [Instruction No.] 403 [natural probable consequences]. Example please? Definition for 'probable.' Definition of 'natural.'"

The jury found defendants not guilty of first degree murder. It found each defendant guilty of second degree murder, but found the associated gang enhancement not true. The trial court sentenced Lockett to a total prison term of 15 years to life. Henderson was sentenced to a total prison term of 30 years to life, plus 5 years. The court sentenced Sullivan to a total prison term of 17 years to life.

## DISCUSSION

### I. Substantial Evidence Supported the Verdicts

Defendants argue the evidence was insufficient to support the murder convictions. They contend the jury's findings indicate the jury must have rejected a direct aiding and abetting theory in favor of the natural probable consequences theory, yet that theory was not supported by the evidence. Defendants further assert the trial court erred by instructing the jury on the natural and probable consequences theory. We disagree and conclude substantial evidence supported the jury's second degree murder conviction based on a natural and probable consequences theory.[9]

---

[9] Although each defendant has filed a separate appeal, they each have made similar arguments, and have joined the arguments in each other's briefs. Thus, we consider the arguments together.

10

### A. Applicable Legal Principles

#### i. Standard of Review

" 'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Smith* (2014) 60 Cal.4th 603, 617 (*Smith*).) " ' "On appeal, we . . . must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]" [Citation.]' [Citation.]" (*People v. White* (2014) 230 Cal.App.4th 305, 315, fn. 13.)

This standard of review applies to claims involving both direct and circumstantial evidence. " 'We "must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" [Citation.] "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]" [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]' [Citation.]" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

#### ii. Aiding and Abetting Liability

In *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), our high court recently discussed and clarified the principles regarding aiding and abetting liability and the natural and probable consequences doctrine. As the court explained, under Penal Code section 31,

11

a principal in a crime includes all persons " 'concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission.' " (§ 31; *Chiu*, at p. 161.)

Under the natural and probable consequences doctrine, " ' "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' [Citations.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citation.]" (*Chiu, supra,* 59 Cal.4th at p. 161.)

"A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' [Citation.] Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*Id.* at pp. 161-162.)

**B. Substantial Evidence Supported the Second Degree Murder Conviction on a Natural and Probable Consequences Theory of Aiding and Abetting**

Defendants advance two arguments. First, they contend the evidence was insufficient for the jury to conclude the shooter was a participant in the intended crime of assault and battery. Second, they argue that even if the jury could properly find the shooter was a co-participant, there was insufficient evidence to support the conclusion that Houston's murder was a reasonably foreseeable consequence of the intended assault and battery. We reject both arguments.

12

### i. The evidence was sufficient for the jury to conclude the shooter aided and abetted the assault and battery

The shooter did not have to directly participate in the target assault and battery for the natural and probable consequences doctrine to apply. "The statutes and, accordingly, the natural and probable consequence doctrine, do not distinguish among principals on the basis of whether they directly or indirectly aided and abetted the target crime, or whether they directly or indirectly aided and abetted the perpetrator of the nontarget crime. An aider and abettor of the target crime is guilty of any crime that any principal in that target crime commits if it was a natural and probable, i.e., reasonably foreseeable, consequence of the target crime." (*Smith, supra,* 60 Cal.4th at p. 613.)

In other words, if the evidence was sufficient for the jury to conclude the shooter aided and abetted the assault and battery, it could properly determine whether the subsequent crime he committed—murder—was a natural and probable consequence of the assault and battery, thus implicating the other defendants. We conclude the evidence was sufficient for the jury to find the shooter was an aider and abettor in the assault and battery.

"Aider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him carry out the offense. [Citation.] '[W]hile mere presence at the scene of an offense is not sufficient in itself to sustain a conviction, it is a circumstance which will tend to support a finding that an accused was a principal. [Citations.]' [Citation.] ' "[C]ompanionship, and conduct before and after the offense" ' are also relevant to determining whether a defendant aided and abetted a crime. [Citations.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.)

In this case, the evidence established that after the defendants dropped off Moore and her baby, they drove away with the singular purpose of going back to fight Houston and his family. The jury could reasonably infer defendants picked up both Wilson *and* the shooter to assist in the fight or, at a minimum, as backup. Even if the jury credited portions of Lockett's testimony, it could draw a reasonable inference from his testimony

13

that picking up the shooter had a purpose related to the impending brawl. Lockett testified that everyone in the car discussed fighting and being prepared to fight. Once defendants parked the SUV, the shooter got out of the car and accompanied defendants to meet Houston's group. The jury could interpret this as displaying an intent to help defendants carry out the assault and battery. While there was evidence the shooter to some extent "lagged" behind defendants, he was perceived as being with them as the two groups met and prepared to fight, further suggesting he shared their intent to engage in an assault and battery. (*People v. Le Grant* (1946) 76 Cal.App.2d 148, 156, abrogated on another ground as stated in *People v. Cox* (2000) 23 Cal.4th 665, 675.) Moreover, the shooter's act of firing two shots in the air could be interpreted as aiding and abetting the assault, and further establishing the shooter's participation in the target crime. In addition, after the shooting, the shooter rode away in the SUV with the defendants.

This evidence was sufficient for the jury to conclude beyond a reasonable doubt that, rather than being a lone wolf unattached to defendants' plans for a brawl, the shooter aided and abetted the assault and battery as backup or as a reinforcement. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409-410 [defendant did not just happen by the scene of the crime; he was not surprised by perpetrator's conduct and jury could infer his presence was meant to intimidate, divert suspicion, and watch out for others].) "An aider and abettor is someone who, with the necessary mental state, 'by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*Smith, supra,* 60 Cal.4th at p. 616.) Here, the shooter did not just show up to the brawl. He came with the defendants, and the jury could reasonably infer that he knew the defendants would engage in assault and battery, he intended to facilitate that offense, and, both with his presence and by acting as backup, he aided and encouraged the commission of the assault and battery. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1129; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

14

### ii. Substantial evidence supported a conclusion that second degree murder was a natural and probable consequence of the assault and battery

The evidence was also sufficient to support a finding that second degree murder was a natural and probable consequence of the assault and battery in this case. As explained above, a principal in the target crime is liable for the crime committed by another principal in the target crime, if that nontarget offense is a natural and probable consequence of the intended crime. "A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.] . . . Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*Chiu, supra,* at pp. 161-162.)

Here, there was evidence defendants sought out a confrontation with Houston's group. They picked up two additional men as backup, including the shooter. Although the jury rejected the allegation that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further and assist in criminal conduct by gang members, it could still properly consider that during the argument that precipitated the brawl, Sullivan invoked a gang name, and Coulter responded with a purported association with members of a rival gang. Even though of the assembled individuals, only Sullivan was a known gang member, Sullivan and Coulter deliberately injected gangs into the dispute. There was evidence that Sullivan said he would have to call one of his "homies" to report he "got into it" with someone from a rival gang. The defendants then picked up Wilson, a relative, and the shooter, who was wearing at least one color associated with Sullivan's gang. The jury could reasonably infer the shooter was Sullivan's fellow gang member. Although Henderson drove the SUV to pick up Moore initially—in his step-father's vehicle—on the way back to the confrontation, Lockett drove the SUV. He testified he responded to Wilson's request to pick up the shooter by saying he was just the person with a valid license. The prosecutor argued this detail indicated the defendants knew there was a gun in the car, and therefore they wanted to exercise additional caution in case they were stopped by the police. The jury could reasonably have accepted this inference.

15

Thus, defendants returned to have a violent confrontation with Houston's group. They were prepared to fight, and they increased their numbers by bringing along Wilson and the shooter. Gang names and affiliations had been invoked by one person on each side of the dispute. Even if the defendants did not go to the brawl intending to kill anyone, under all the circumstances presented, a jury could find that a reasonable person in the defendants' position would have or should have known a murder was a reasonably foreseeable consequence of the assault and battery. (*People v. Medina* (2009) 46 Cal.4th 913, 926.)

As both sides have recognized, numerous courts have identified circumstances in which murder was a natural and probable consequence of an assault or battery. The defendants also point out that many of these cases involve confrontations between gang members, therefore, unlike the case at bar, the jury could consider the well-known violent behavior of gangs when determining whether murder was a foreseeable consequence of the target crime. (See *Smith, supra,* 60 Cal.4th at pp. 619-620 [murder a foreseeable consequence from gang-related assault or battery or disturbing the peace]; *People v. Medina, supra,* 46 Cal.4th at pp. 920-923 [collecting cases and concluding shooting was a reasonably foreseeable consequence of the gang assault]; *People v. Miranda, supra,* 192 Cal.App.4th at pp. 409-410 [jury could reasonably conclude defendant knew there were firearms in the car and that a fellow gang member would likely use one of them in the commission of a gang-related robbery]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1451 [even if jury believed defendant was ignorant of a gun, it could still find murder to be a foreseeable consequence of violent gang confrontation]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055 [case was a "textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire"]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 500 [based on evidence at trial including gang expert testimony, and "the common knowledge that an unfortunate reality of modern times is that gang confrontations all too often result in death," jury could find homicide a reasonably foreseeable consequence of assault]; see also *People v. Gonzales* (2001) 87 Cal.App.4th 1, 11 [evidence that defendants (gang members) ran to fight with

rival gang members and one defendant was visibly armed; even without testimony of expert on gangs there was substantial evidence to support a finding murder was a natural and probable consequence of the fight].)

In arguing the evidence was insufficient, defendants cite these cases and focus on the jury's not true finding on the gang allegation. They assert that in the absence of a true finding on the gang enhancement, there was no evidence from which the jury could conclude that a dispute involving only personal animosity would foreseeably lead to murder, or from which the jury could infer the defendants knew or should have known the shooter was armed.

However, while the above cases involved gang confrontations, the underlying principles informing the reasoning are not limited to crimes found to be committed for the benefit of a gang. Instead, the gang evidence was *a factor* that could be considered by the jury to conclude it was reasonably probable a target crime would lead to a homicide. Moreover, courts have affirmed jury findings of murder based on the natural and probable consequences theory in other types of cases as well. For example, in *People v. Guillen* (2014) 227 Cal.App.4th 934, multiple defendants—prison inmates—participated in a coordinated attack on the victim, also an inmate, in the belief that he was a child molester. There was evidence the defendants knew the beating would go beyond the normal "taxing" that occurs in prison, and many of the inmates were eager to participate. The beating was prolonged, lasting around 30 minutes. Between 30 and 50 inmates participated. (*Id.* at p. 995.) The court upheld a jury verdict finding the defendants guilty of second degree murder, concluding "there was sufficient evidence to conclude a reasonable person in [the defendants' position] would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury within jail culture." (*Id.* at p. 996.)

17

Similarly, in a much earlier case, a court upheld murder convictions arising out of a planned assault that turned into a fatal bludgeoning. In *People v. King* (1938) 30 Cal.App.2d 185, 200-201, the court rejected the argument that a homicide was not a natural and probable consequence of a planned assault, even as to two participants who were not present during the actual murder. The court explained: "Here, several men set out to beat up another. In the words of [one defendant], he 'sent them over to tamp the chief.' Preparations were made for trouble. It was known that [the victim] was vigorous and strong. One [man involved in the beating], at least, prior to setting out on the expedition, equipped himself with a bludgeon. At the scene of the expected trouble others were asked to stand by. Not being able to get at the victim the first day, the majority returned the second day and proceeded to the victim's place of abode aboard ship. They prepared, and were prepared, to meet force with force and to overcome resistance at any cost. The natural and probable consequence of such an undertaking is homicide, and the homicide here committed by one of the conspirators is nothing less than murder." (*Id.* at pp. 200-201.)

The evidence in this case is similar. Although the initial argument appears to have been trivial, the defendants took it seriously and warned they would return. The brawl was not an ambush, as in *King,* but the defendants set out to fight Houston and those with him. They picked up two additional men for backup or additional fighting power. While the jury found the crime in this case was not committed in association with, for the benefit of, or at the direction of a criminal street gang, it could still have believed tensions were heightened as the result of Sullivan and Coulter invoking gang names during the altercation that precipitated the dispute. Further, to the extent the jury inferred the shooter was a gang member, it could reasonably conclude that when defendants brought a gang member to fight, it was then reasonably foreseeable that the gang member would escalate the anticipated violence into a deadly confrontation, even without any express

18

knowledge that the gang member was armed.[10] There was sufficient evidence to conclude a reasonable person in defendants' position would know murder was a natural and probable consequence of battery and assault under the circumstances of this case.

In sum, substantial evidence supported a jury finding that the shooter was a principal in the target assault and battery, and that the murder he committed was a reasonably foreseeable consequence of the assault and battery perpetrated against Houston and his associates. We accordingly reject the argument that the trial court should not have instructed the jury on the natural and probable consequences doctrine. (*People v. Campbell, supra,* 25 Cal.App.4th at p. 408.) Substantial evidence supported the application of this theory of liability to this case.[11]

## II. The Abstract of Judgment as to Henderson Must Be Modified

Henderson contends, and the People concede, that the abstract of judgment in his case did not accurately reflect the sentence imposed, which was an indeterminate term of 30 years to life, plus a five-year determinate term due to the prior serious felony enhancement. This was the term the trial court pronounced in court. We agree the abstract of judgment must be corrected to reflect the judgment pronounced in court. (*People v. Scott* (2012) 203 Cal.App.4th 1303, 1324.)

---

[10]  "[A]lthough evidence indicating whether the defendant did or did not know a weapon was present provides grist for argument to the jury on the issue of foreseeability of a homicide, it is not a necessary prerequisite." (*People v. Godinez, supra,* 2 Cal.App.4th at p. 501, fn. 5.)

[11]  Given that we find there was substantial evidence to support the verdicts, we summarily dismiss defendants' similar argument that the jury should not have been instructed on a natural and probable consequences theory. " 'Substantial evidence' in this specific context is defined as evidence which is 'sufficient to "deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded' " that the particular facts underlying the instruction did exist.' [Citations.]" (*People v. Burnham* (1986) 176 Cal.App.3d 1134, 1139-1140.)

## DISPOSITION

As to defendant Henderson the trial court is ordered to correct the abstract of judgment by striking the reference to a term of 35 years to life, and indicating Henderson was sentenced to a total prison term of 30 years to life, plus 5 years.  The trial court is further ordered to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.


BIGELOW, P.J.

We concur:



RUBIN, J.



FLIER, J.

20